NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3802-12T4

NEW JERSEY TRANSIT CORPORATION,

    Plaintiff-Appellant/
Cross-Respondent,

v.

MARY FRANCO, CAROL FRANCO,
M & C FRANCO & CO.,

    Defendants-Respondents/
Cross-Appellants,

and

NORTH COUNTY COLLISION, INC.;
VANESSA EXPRESS CO., INC.; CITY
OF HOBOKEN; TOWNSHIP OF WEEHAWKEN;
CITY OF UNION CITY; COUNTY OF HUDSON;
PUBLIC SERVICE ELECTRIC AND GAS COMPANY;
UNITED WATER COMPANY; NORTH HUDSON
SEWERAGE AUTHORITY; NEW JERSEY
DEPARTMENT OF ENVIRONMENTAL PROTECTION,

    Defendants.

| APPROVED FOR PUBLICATION |
| :---: |
| October 19, 2016 |
| APPELLATE DIVISION |

_____

Argued January 5, 2016 — Decided October 19, 2016

Before Judges Reisner, Leone, and Whipple.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-6300-09.

Victoria A. Flynn argued the cause for appellant/cross-respondent (DeCotiis, FitzPatrick & Cole, LLP, attorneys; Michael

J. Ash, of counsel and on the briefs; Ms. Flynn, on the briefs).

Paul V. Fernicola argued the cause for respondent/cross-appellant (Paul V. Fernicola & Associates and Joseph R. Torre, P.A., attorneys; Mr. Fernicola, of counsel and on the briefs; Robert E. Moore, on the briefs).

The opinion of the court was delivered by

LEONE, J.A.D.

Plaintiff New Jersey Transit Corporation appeals from the March 4, 2013 final judgment for $8,150,000, which the jury awarded as just compensation for plaintiff's condemnation of a property ("Property") owned by defendants Mary Franco, Carol Franco, and M & C Franco & Co. Defendants cross-appeal a February 12, 2014 order placing $1,967,865 in escrow to cover estimated costs for environmental cleanup of the Property.

We hold defendants' proposal to build a cul-de-sac on its Weehawken lots to serve proposed apartment buildings on other lots requires either a use variance for a private driveway or acceptance by Weehawken as a public street. Because defendants failed to show a reasonable probability that Weehawken would have granted either form of relief, we reverse the March 4, 2013 final judgment and remand for a new trial on just compensation. Because the trial court properly calculated the escrow based on the estimated remediation cost for the highest and best use used

to calculate defendants' award, we affirm the February 12, 2014 order.

## I.

The 1.89-acre Property was comprised of three parcels in three different municipalities. A 51,362-square-foot parcel was in the City of Hoboken's "Light Industrial" zone but was cut off from the rest of Hoboken by the tracks of the Hudson-Bergen Light Rail System on the Property's southern border. A 21,687-square-foot parcel was in the City of Union City's "Multi-Family — Residential" zone but was cut off from the rest of Union City by the Palisades Cliffs on the Property's western border. The remaining 9585-square-foot parcel was in the Township of Weehawken's R-3 "One, Two (2) and Three (3) Family Residence Zone." The Property's northern border was West 18th Street and its elbow intersection with West 19th Street, two one-way Weehawken streets which provided road access respectively from and to the Property. The Property's eastern border was an industrial building. The Property contained an industrial garage in 2009 and previously had other industrial uses.

In 2009, plaintiff filed a complaint in condemnation to acquire the Property for public use pursuant to N.J.S.A. 27:25-13(b). Plaintiff offered $934,500 for the Property, subject to

the need to remediate any contamination.  Commissioners awarded just compensation of $1,350,000.  Plaintiff and defendants sought a trial de novo in the Law Division.

Plaintiff's original appraisal report valued the Property at $990,000 if used for industrial development.  Defendants' original appraisal report valued the Property at $9,996,000 if used for: a twelve-story, seventy-two-apartment high-rise building in the Union City parcel; a four-story, fifty-four-apartment mid-rise building in the Hoboken parcel; and five townhouses in the Weehawken parcel.  Defendants proposed road access to the Property by a private driveway extending Weehawken's West 19th Street.

The trial court adjourned the trial date, permitting plaintiff to produce a new appraisal report and defendant to respond.  Plaintiff's second appraisal report recognized the highest and best use of the Property was for multifamily dwellings.  The report valued the Property at $1,650,000 if used for thirty-five multifamily residences.

Defendants' second appraisal report valued the Property at $9,273,655 if used just for the high-rise and mid-rise buildings.  The report deleted the five townhouses from the Weehawken parcel, which would instead be used for a cul-de-sac providing access from West 19th Street.

Plaintiff produced rebuttal reports, stating defendants' proposed project would not receive municipal approval and estimating remediation would cost $1,967,865. Defendants produced final concept plans containing the cul-de-sac. On October 3, 2012, the court denied plaintiff's motions in limine seeking to exclude defendants' concept plans and expert reports.

After a seven-day trial, the jury determined just compensation for the Property was $8,150,000, plus interest and costs. The court's March 4, 2013 order entered final judgment for $8,150,000, ordered the deposit in escrow of $1,967,865 as the estimated cost to remediate the contamination, and denied defendants' motion to bar plaintiff from filing a cost recovery action. Plaintiff appealed, and defendants cross-appealed.

We temporarily remanded for a hearing on the estimated remediation costs. On February 12, 2014, the trial court entered an order keeping the $1,967,865 in escrow. Defendants amended their cross-appeal to appeal that order.

## II.

We must hew to our standard of review. Plaintiff's appeal challenges the trial court's denial of its requests to exclude expert testimony and reports concerning municipal approval of defendants' proposal. We must apply a "deferential approach to a trial court's decision to admit expert testimony, reviewing it

against an abuse of discretion standard." Townsend v. Pierre, 221 N.J. 36, 53 (2015) (citation omitted). However, we must also consider whether a variance "was needed in the first instance. That is purely a question of law . . . subject to de novo review." Nuckel v. Borough of Little Ferry Planning Bd., 208 N.J. 95, 102 (2011).

### III.

"In a condemnation action the determination sought is the amount of just compensation. Just compensation is a function of the value of the property in light of its highest and best use, which is ordinarily evaluated in accordance with current zoning ordinances." Borough of Saddle River v. 66 East Allendale, LLC, 216 N.J. 115, 119 (2013). "To constitute the 'highest and best use,' a use must be . . . 'legally permissible'" in that zone. Hous. Auth. v. Suydam Inv'rs, L.L.C., 177 N.J. 2, 20 (2003) (citation omitted); see 66 East Allendale, supra, 216 N.J. at 137.

However, "[c]ertain circumstances may permit valuation to include an assessment of a change in the permitted use of a property, but only if there is a reasonable probability that a zoning change would be granted." 66 East Allendale, supra, 216 N.J. at 119. "If valuation of a property based on another use is to be considered by a jury, the determination of reasonable probability of a zoning change must be made by the judge before

the evidence is presented to the jury, and it must be made clearly to enable appellate review." Ibid. Thus, "condemnation actions may include competing experts opining over the likelihood of obtaining a zoning change if the court first determines that there is a reasonable probability of such a change." Id. at 142.

The crucial issue on appeal is whether the creation of a cul-de-sac on the Weehawken parcel of the Property would have required and received approval by Weehawken.[1]  State law provides "[n]o permit for the erection of any building or structure shall be issued unless the lot abuts a street giving access to such proposed building or structure."  N.J.S.A. 40:55D-35.  To provide access from the high-rise and mid-rise buildings to an abutting street, and to provide a driveway between the buildings' parking garages and the street, defendants proposed a cul-de-sac extending Weehawken's West 19th Street.  The cul-de-sac would occupy the majority of each of the lots in Weehawken.

---

[1]  Plaintiff also notes the complexity of seeking land-use approvals for a property in three different municipalities. However, on appeal plaintiff does not contest that the high-rise building in the Union City parcel could be developed as of right.  Nor does plaintiff show that Hoboken would not have granted a use variance allowing the construction of the mid-rise building.  Indeed, Hoboken's 2004 Master Plan proposed the section of Hoboken cut off by the Light Rail tracks be rezoned as residential to be more similar to Weehawken's zoning.

A.

Use of defendants' Weehawken parcel as a cul-de-sac would be a "use" of that land. The Township of Weehawken Code (Code) provides: "Use shall mean the specific purpose for which land or a building is designed, intended, occupied or maintained." Code § 23-3.1. "No building or premises shall hereafter be erected or used for any purpose other than a purpose permitted in the zone in which the building or premises is located[.]" Code § 23-4.2. A driveway is not included in the definition of a "[s]tructure," and is thus not within the definition of "[b]uilding," but it remains a use of the land and the premises. Code § 23-3.1.

The permitted uses for lots in Weehawken's R-3 "One, Two (2) and Three (3) Family Residence Zone" were one-, two-, and three-family dwellings; townhouses with driveways covering not more than twenty-five percent of the lot; clubs; and specified accessory uses. Code §§ 23-5.2 to -5.4. The R-3 Zone did not list the use of a lot solely or primarily as a street, driveway, or cul-de-sac as a permitted, conditional, or accessory use.

The situation here resembles that in Nuckel. There, our Supreme Court considered whether a developer who proposed to place a driveway on one lot to service a hotel on the adjacent lot was "required to obtain variances under the Municipal Land

8                                                        A-3802-12T4

Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, specifically N.J.S.A. 40:55D-70(d)(1) and (2)." Nuckel, supra, 208 N.J. at 97.[2] N.J.S.A. 40:55D-70 provides "[t]he board of adjustment shall have the power to . . . d. [i]n particular cases for special reasons, grant a variance . . . to permit: (1) a use or principal structure in a district restricted against such use or principal structure[.]"

In Nuckel, supra, the zoning ordinance did "not address driveways, access roads, or the like as permitted uses or conditionally permitted uses in the [zone]." 208 N.J. at 98. The Supreme Court observed that was "likely because, as a rule, . . . a driveway is considered an accessory use." Id. at 104. However, the Court emphasized that the zoning ordinance in Nuckel defined an accessory use as "a use which is customarily incidental and subordinate to the principal use of a lot or a building and which is located on the same lot." Ibid. (citation omitted). The Court ruled such language "precludes the characterization of a driveway on [one lot] as accessory to the hotel on [another lot]." Ibid. The Court then reasoned: "[I]f it is not accessory, what is the nature of the driveway? We conclude that it must be a new principal use." Id. at 105.

---

[2] Here, the only issue is a variance under N.J.S.A. 40:55D-70(d)(1), which is also referred to as a "use variance," "D variance," or "(d)(1) variance."

Though acknowledging the argument that "[a] driveway in itself is neutral," the Court in <u>Nuckel</u> ruled that, under such an argument, "neutrality only allows a driveway to 'take[] color from the uses'" which it serves. <u>Ibid.</u> (alterations in original) (quoting <u>Beckmann v. Township of Teaneck</u>, 6 <u>N.J.</u> 530, 536 (1951)). "It does not prevent a driveway from constituting a new 'use' in and of itself." <u>Ibid.</u> In any event, such an "argument, at best, would allow the driveway to be characterized as a new principal hotel use, but not an accessory use." <u>Ibid.</u>

In <u>Nuckel</u>, the lot containing the driveway was zoned for hotels but already had a principal use, an auto-body shop. <u>Id.</u> at 97-98. The Court held, because the municipal "Code prohibits more than one principal use, a (d)(1) variance is required" for use as a driveway. <u>Id.</u> at 105.

Like the zoning ordinance in <u>Nuckel</u>, Weehawken's zoning ordinance provides: "<u>Use, Accessory</u> shall mean a use which is customarily incidental and subordinate to the principal use of a lot or a building and located on the same lot therewith." <u>Code</u> § 23-3.1. Therefore, using the Weehawken lots for a cul-de-sac to serve as the driveway for the high-rise and mid-rise apartment buildings in the adjacent lots would constitute "a new principal use." <u>Nuckel</u>, <u>supra</u>, 208 <u>N.J.</u> at 105. Because that principal use is not permitted in Weehawken's R-3 zone, "a

(d)(1) variance [was] required." Ibid.; see Cox & Koenig, N.J. Zoning & Land Use Admin. § 38-1, at 786-77 (2016).

Similarly here, a use variance would be required even if the cul-de-sac could be viewed as taking its color from the uses which it would serve. Nuckel, supra, 208 N.J. at 105. Such an argument, at best, would allow the cul-de-sac to be characterized as a new principal use, namely high-rise and mid-rise apartment buildings. See Cox & Koenig, supra, § 38-5, at 795-96 (finding it "logical that construction of accessory driveways on [lots on which there was no preexisting use] should imbue them with the characteristics of the use they served" on adjacent lots). Because such a use was not permitted in Weehawken's R-3 zone, a use variance would be required even under this argument. See Angel v. Bd. of Adjustment, 109 N.J. Super. 194, 196-99 (App. Div. 1970) (requiring a variance for a driveway on one lot serving a use in another lot where that use is not permitted in the former lot).

Accordingly, we hold a use variance was required to the extent defendants sought to use their Weehawken lots as a private cul-de-sac connecting the high-rise and mid-rise apartment buildings to the Weehawken streets. However, defendants' experts never opined there was a reasonable probability Weehawken would grant such a variance.

11

Defendants' principal experts were engineer Robert L. Costa, planner Peter G. Steck, and appraiser Jon P. Brody. Based on Costa's original proposal for a private driveway to connect West 19th Street to the high-rise and mid-rise apartment building use in the other lots, Steck testified in his November 28, 2011 deposition that "there would probably need to be a D variance approval in Weehawken for the driveway" because "the accessory component of the use takes the coloration of the principal use."[3] However, Steck did not opine on the likelihood Weehawken would grant a use variance. Steck's original April 19, 2011 report failed to mention the need for this use variance. Brody also failed to mention the need for a use variance from Weehawken either in his April 20, 2011 original appraisal report or his November 28, 2011 deposition.

On January 20, 2012, the trial court heard plaintiff's motion to strike defendants' original expert reports. Plaintiff's counsel argued Steck's report was "deficient for failure to recognize that Weehawken and Weehawken's land use boards had jurisdiction over both the improvements in Hoboken

---

[3] At trial, Steck confirmed that because "a private driveway through Weehawken" would be an "accessory use [which] takes on the coloration of the principal use, . . . it would have triggered the need for a use variance." Steck acknowledged he "didn't form an opinion" on whether Weehawken would have granted a use variance.

and Union City by virtue of the access through the Weehawken parcel." Defendants' counsel agreed Steck "overlooked the fact that that private driveway, because it provides access to the permitted use in Union City and to the Hoboken parcel[,] . . . is as much a part of those high-rise and mid-rise developments as the buildings themselves and that it technically required a use variance from Weehawken for that private driveway" because "the Weehawken zone only allows townhouses."

Defendants' counsel "wanted to amend the report to resolve the access issue to eliminate the need for the use variance." Thus, defendants filed three revised expert reports right before the January 20, 2012 argument on plaintiff's motion to strike defendants' original expert reports.[4]

B.

Defendants' revised expert reports tried to avoid the need for Weehawken's approval by offering to dedicate the cul-de-sac as a public street. Costa's January 16, 2012 revised concept

---

[4] On January 23, 2012, a motion judge denied plaintiff's motion to strike defendants' original expert reports. The court instead allowed plaintiff to re-depose defendants' three experts and to produce rebuttal reports in response to defendants' new expert reports. Plaintiff has not expressly appealed that order. Plaintiff has expressly appealed the May 24, 2012 order by another motion judge denying defendants' motion to strike plaintiff's rebuttal reports but allowing defendants to produce rebuttal reports. In any event, plaintiff has not shown either order was an abuse of discretion.

plan included the cul-de-sac as a "proposed right of way dedication to West 19th Street." Steck's January 17, 2012 revised report proposed "the entire 9,585 square foot [Weehawken] parcel would be dedicated to the Township of Weehawken as a public right-of-way thereby providing compliant lot frontage and public road access to the Union City and Hoboken portions of the tract." Steck's report claimed this would "not involve any zoning review and consequently would be permitted in Weehawken's R-3 Zone." Brody's January 18, 2012 revised appraisal report agreed the "highest and best use is for [the Weehawken parcel] to be employed as [a] cul-de-sac extension of West 19th Street providing access for the development of the balance of the site, [namely] those lands lying in Hoboken and Union City." Brody again assumed no need for approval by Weehawken.

However, "[a]n individual cannot, at his pleasure, create public highways for his own benefit upon his own land, and impose upon the public the burthen of maintaining them." Holmes v. Mayor of Jersey City, 12 N.J. Eq. 299, 308 (E. & A. 1857); see Roger A. Cunningham & Saul Tischler, Dedication of Land in New Jersey, 15 Rutgers L. Rev. 377, 381-82 & nn.29-31 (1961). "Of course, the public is not under any duty to accept a dedication of land." Cunningham & Tischler, supra, 15 Rutgers

L. Rev. at 395 & n.99. Thus, "[a] city is not required to accept a dedicated street." N.J. Junction R.R. Co. v. Mayor of Jersey City, 68 N.J.L. 108, 109 (Sup. Ct. 1902), aff'd o.b., 70 N.J.L. 826 (E. & A. 1904). "Dedication and acceptance are separate and distinct matters." Englander v. Township of West Orange, 224 N.J. Super. 182, 188 (App. Div. 1988). "It is settled that mere dedication of streets . . . does not constitute them public highways, unless or until such streets are in some way accepted by public authorities[.]" Highway Holding Co. v. Yara Eng'g Corp., 22 N.J. 119, 127 (1956).

"Once an owner of land makes an offer of dedication, . . . [t]he offer remains in place until the municipality accepts or rejects it[.]" Township of Middletown v. Simon, 193 N.J. 228, 241 (2008). Generally, "the actual dedication to public use is consummated when the dedication is accepted by an appropriate ordinance or resolution of the municipality." State v. Birch, 115 N.J. Super. 457, 464 (App. Div. 1971). The Legislature has provided: "The governing body of every municipality may make, amend, repeal and enforce ordinances to . . . accept any street, highway, lane, alley, square, beach, park or other place, or any part thereof, dedicated to public use, and thereafter, improve and maintain the same." N.J.S.A. 40:67-1, -1(b); see N.J.S.A.

40:67-2.[5]  Acceptance of "dedication may also be accomplished by other 'official conduct which manifests an intent to treat the land in question as dedicated to the public use.'"  Englander, supra, 224 N.J. Super. at 188 (quoting Birch, supra, 115 N.J. Super. at 464); see State v. Township of South Hackensack, 111 N.J. Super. 534, 539 (App. Div. 1970) (requiring acceptance by conduct to be "unequivocal, clear and satisfactory"), certif. denied, 57 N.J. 433 (1971).  Thus, whether by ordinance or by official conduct, it would be Weehawken's choice whether to accept defendants' offer to dedicate the cul-de-sac.

Steck's revised report suggested Weehawken's engineer could simply review defendants' offer of dedication.  However, it is generally the governing body which accepts the dedication.  In his February 14, 2012 deposition, Steck acknowledged defendants could only make "an offer to the governing body of Weehawken to accept [the cul-de-sac] as a public street."  Neither Steck nor defendants' other experts ever opined there was a reasonable probability Weehawken's governing body would accept the dedication.

Absent Weehawken's acceptance of defendants' "dedication," defendants would "retain[] ownership" of the Weehawkin lots.

_____

[5] Similarly, "[a] municipality that wishes to reject a dedication may pass an ordinance to that effect."  Simon, supra, 193 N.J. at 242; see N.J.S.A. 40:67-1, 19.

<u>Township of Middletown v. Simon</u>, 387 <u>N.J. Super.</u> 65, 75 (App. Div. 2006), <u>aff'd in part, rev'd in part</u>, 193 <u>N.J.</u> 228. Thus, the proposed cul-de-sac would remain the private driveway of defendants, who "as the titleholder at all times had the right to use the property lawfully, subject, however, to the dedication." <u>Osterweil v. City of Newark</u>, 116 <u>N.J.L.</u> 227, 231 (E. & A. 1936). However, as set forth above, a use variance would be required to use the Weehawken parcel lawfully as a private driveway.

Thus, Weehawken's approval was necessary whether the cul-de-sac was private or dedicated for public use. Indeed, it would be contrary to the purposes of the municipal regulation of land use to allow a party to escape the need to obtain a use variance by making an offer to dedicate which the municipality will not accept. "It is the intent and purpose of" the MLUL "[t]o encourage municipal action to guide the appropriate use or development of all lands in this State" and "[t]o ensure that the development of individual municipalities does not conflict with the development and general welfare of neighboring municipalities." <u>N.J.S.A.</u> 40:55D-2(a), (d).

Although ordinances accepting or rejecting an offer to dedicate a driveway as a public street are not "zoning ordinances," they reflect "zoning considerations." <u>Howell</u>

17

Props., Inc. v. Township of Brick, 347 N.J. Super. 573, 581 (App. Div.), certif. denied, 174 N.J. 192 (2002). Therefore, under 66 East Allendale, we hold defendants were required to show a reasonable probability Weehawken would either grant a use variance for the cul-de-sac or accept the dedication of the cul-de-sac as a public street. See N.J. Transit Corp. v. Mori, 435 N.J. Super. 425, 428, 432-33 (App. Div. 2014). Defendants' experts offered neither opinion, rendering their opinions legally inadequate. Indeed, they offered the legally-inaccurate opinion that Weehawken had no say in the matter.

C.

Prior to trial, plaintiff filed a motion in limine to bar introduction of the revised concept plans prepared by Costa and the revised expert reports by Steck and Brody, and to bar their testimony.[6] Plaintiff contended the experts' opinions failed to analyze whether there was a reasonable probability Weehawken would grant a use variance. Plaintiff also argued it was

_____

[6] Plaintiff earlier filed a motion to strike defendants' expert reports and concept plans. A third motion judge denied that motion on August 10, 2012, stating only "no prejudice shown to moving party for 10 day late service of report." Plaintiff appeals that order but has not shown it was an abuse of discretion to grant that extension or to allow the slightly altered July 3, 2012 concept plans. To the extent plaintiff's motion to strike raised the larger issues raised by its motion in limine, it is sufficient that we address the motion in limine.

speculative that Weehawken would accept dedication of the cul-de-sac. As a result, plaintiff moved to strike the experts' opinions as net opinions. Alternatively, plaintiff asked the court to hold an evidentiary hearing under N.J.R.E. 104 to determine the admissibility of the experts' opinions.

After hearing argument, the trial court denied plaintiff's motion on October 3, 2012. The court ruled the opinions of defendants' experts were not net opinions, and found the development was legally permissible, for two reasons.

First, the trial court relied on Steck's testimony concerning the Residential Site Improvement Standards (RSIS). The court found "it is reasonably probable in light of anticipated compliance with RSIS that Weehawken would approve development of the cul-de-sac." However, Steck did not testify the RSIS made it reasonably probable Weehawken would accept the cul-de-sac as a public street. Rather, Steck testified that the proposed cul-de-sac was in full compliance with the RSIS, that the municipality was obligated to accept those standards, and that, if a site plan was required, "Weehawken would be obligated to accept it as a conforming RSIS cul-de-sac." However, Steck testified he would "leave it up to the attorneys to say whether in such a situation Weehawken would be obligated to accept it as a public street."

In any event, the RSIS are "a uniform set of technical site improvement standards" that address the "technical requirements" for "construction work on, or improvement in connection with," site improvements such as streets in residential developments. N.J.S.A. 40:55D-40.1, -40.2(e), -40.2(f); see Northgate Condo. Ass'n v. Borough of Hillsdale Planning Bd., 214 N.J. 120, 143 (2013). For example, the RSIS establish a cul-de-sac's maximum average daily traffic, width, radius, grade, and construction materials. N.J.A.C. 5:21-4.1, -4.2 nn.(e), (m), -4.19. Such RSIS provisions "supersede any site improvement standards incorporated within the development ordinances of any municipality." N.J.S.A. 40:55D-40.5.

However, the RSIS do not purport to determine whether cul-de-sacs may be built on one lot to serve a use on another lot, whether use variances should be granted, or whether offers of dedication should be accepted. Rather, the Legislature stressed such "policymaking aspects of development review are best separated from the making of technical determinations." N.J.S.A. 40:55D-40.2(g); see N.J. State League of Municipalities v. Dep't of Cmty. Affairs, 158 N.J. 211, 218, 226 (1999). The Legislature expressly provided: "Nothing contained in this act shall in any way limit the zoning power of any municipality." N.J.S.A. 40:55D-40.6. Similarly, "[n]othing contained in these

20

rules shall be construed to limit the powers of any municipality to establish and enforce any requirement concerning . . . reservation of areas for public use," including streets. N.J.A.C. 5:21-1.5(d), (d)(1); see N.J.S.A. 40:55D-38(b)(4), -44. Accordingly, defendants, by proposing a cul-de-sac constructed in compliance with the RSIS, could not deprive Weehawken of its power to decide whether to grant a use variance or accept an offer of dedication as a public street.[7]

Second, the trial court cited the opinion of plaintiff's planner that the cul-de-sac was unnecessary because defendants' Property was not "landlocked." Plaintiff's planner claimed a narrow finger of the Property, protruding between the adjacent industrial building and the Light Rail tracks, connected to "Adams Street," a paper street on the Hoboken parcel. There was a dispute whether the paper street could be developed as it was cut off from the streets of Hoboken by the Light Rail tracks. Further, even if developed, the paper street would still route traffic from the Property onto the same Weehawken streets.

---

[7] Plaintiff also contends the trial court improperly prohibited it from responding to Costa's revised concept plans and from offering testimony on whether they satisfied the RSIS. On remand, to the extent defendants assert those concept plans satisfy the RSIS, plaintiff shall have an opportunity to respond.

More importantly, defendants' experts admittedly did not propose use of that paper street or that narrow finger of the Property to provide road access. Indeed, such use would be inconsistent with defendants' proposed development, which placed the mid-rise building as close as legally possible to both the Light Rail tracks and the adjacent industrial building, thus precluding any vehicular access from either the mid-rise or high-rise buildings to the narrow finger or the paper street.

Instead, defendants' experts opined road access was needed through a cul-de-sac on the Weehawken parcel. The issue before the trial court was the validity of their opinion that Weehawken did not need to approve the cul-de-sac. Their opinion would have been undermined by the possibility of alternate road access. See Angel, supra, 109 N.J. Super. at 198 (upholding the denial of a use variance for an access road because the developer's property was not "landlocked" and had "a viable alternative" means of access). Further, using that alternate access would have been incompatible with the proposed 126-unit development on which defendants based their appraisal.

Thus, we reject the trial court's reasons for denying plaintiff's motion in limine to exclude the opinions of defendants' experts, which were inadmissible because they were legally inadequate and legally inaccurate. As in 66 East

<u>Allendale</u>, <u>supra</u>, the trial court did not perform its "gatekeeping function by screening out potentially unreliable evidence and admitting only evidence that would warrant or support a finding that a zoning change is probable." 216 <u>N.J.</u> at 138 (quoting <u>State v. Caoili</u>, 135 <u>N.J.</u> 252, 264 (1994)).[8]

D.

The erroneous admission of defendants' expert testimony was prejudicial. Before the jury, Costa testified Weehawken's land use ordinance had no "jurisdiction or authority over the cul-de-sac." Steck testified that "Weehawken does not have any discretion," that "when an owner builds something in accordance to the RSIS standards, the municipality must accept it," and that "[a]pproval is not needed from Weehawken." He told the jury the authorities in Weehawken "have to accept the cul-de-sac." Brody testified he relied on Costa and Steck. Thus, "[t]he experts' testimony did not cure the deficiency in the required analysis for reasonable probability" but only compounded it. <u>66 East Allendale</u>, <u>supra</u>, 216 <u>N.J.</u> at 145. Because their testimony was legally incorrect and legally inadequate, "the quality of the evidence that the jury was

---

[8] Because the reports were inadmissible for the reasons set forth above, we need not consider whether they were also inadmissible as net opinions or whether the trial court should have held a hearing under <u>N.J.R.E.</u> 104.

23

allowed to consider undermined the soundness of the jury's property valuation determination." Id. at 119.

Moreover, it was unclear whether there was a reasonable probability Weehawken would grant a use variance or accept defendants' offer to dedicate the cul-de-sac as a public street. The proposed cul-de-sac would have been considered a "Street" as defined in Weehawken's Code § 23-3.1, but it was not depicted on an official map or Weehawken's most recent Master Plan. Weehawken requires such streets meet certain requirements:

> Streets not shown on the Master Plan or Official Map shall be arranged so as to provide the appropriate extension of existing streets and shall be suitably located to accommodate prospective traffic and to provide access for firefighting and/or emergency equipment and shall be coordinated so as to compose a convenient system consistent with the Official Map, if any, and with streets shown on the Master Plan.
>
> [Code § 22-10(c)(1) (emphasis added).]

Plaintiff's rebuttal reports included a traffic review, which stressed West 19th Street and West 18th Street were "narrow local streets" restricted to one-way traffic which "experience low traffic volume demand and are difficult to navigate by large vehicles." Plaintiff's traffic expert opined it would be hard for fire trucks to access the cul-de-sac. He added that there was "[n]o provision for circulation around the

24                                                    A-3802-12T4

[proposed high-rise and mid-rise buildings] for fire access," that "safe access for emergency vehicles is not provided," and that "[t]he lack of access and the limitations of the cul-de-sac may be unacceptable to the local fire departments and emergency services." Plaintiff's engineering expert noted the vast majority of the units in both the high-rise and the mid-rise buildings were inaccessible to fire apparatus, which was unlikely "to be approved by the local fire department."

The report of plaintiff's planning expert noted defendants' proposed high-rise and mid-rise apartment buildings were inconsistent with the surrounding Weehawken low-density residential neighborhood and "the Weehawken Master Plan, which places an emphasis on preserving the character of its one-, two- and three-family and townhouse residential neighborhood." He opined Weehawken would object due to "the lack of capacity on West 18th and West 19th Streets to handle traffic generated by the development." He reasoned, as the proposed development was inaccessible from the rest of Hoboken and Union City, that those cities would ask Weehawken to provide fire and other emergency services to the high-rise and mid-rise buildings and that Weehawken would object given the limits on emergency access.

Plaintiff's planning expert opined: "The notion that Weehawken would ever grant use variance approval for any plan

that accommodates what amounts to dense residential development projects in an area served exclusively by local residential streets without providing any benefit to Weehawken whatsoever is beyond comprehension." Similarly, he opined it was "highly unlikely that Weehawken Township would accept the public road dedication" of the cul-de-sac because it would require Weehawken taxpayers to pay "to maintain a roadway that is utilized exclusively by residents of developments who do not pay property taxes in Weehawken."

Thus, Weehawken's approval could not be assumed. See Menlo Park Plaza Assocs. v. Planning Bd., 316 N.J. Super. 451, 461–62 (App. Div. 1998) (rejecting the "[p]laintiff's desire for an outlet road from its proposed development into another municipality," which would "turn a quiet dead-end residential street into a busy thoroughfare," "would detrimentally alter the character of the neighborhood," and would "provide[] no benefit to" that municipality), certif. denied, 160 N.J. 88 (1999); cf. Howell Props., supra, 347 N.J. Super. at 579–88.

E.

Accordingly, the prejudicial error in denying plaintiff's motion in limine, and thus allowing defendants' experts to offer trial testimony which was legally inadequate and legally incorrect, "necessitate[s] a new trial on the issue of just

compensation." 66 East Allendale, supra, 216 N.J. at 119. Prior to the new trial, the trial court shall permit defendants to prepare amended reports to alter the project proposed in the three municipalities or to proffer legally-adequate expert opinion on whether there was a reasonable probability Weehawken would either grant a use variance for, or accept the dedication of, the cul-de-sac. The court shall allow plaintiff to respond to any amended reports or opinions offered by defendants. The court must then "examine the evidence proffered in support of the reasonable probability of a zoning change and determine whether it can render its required determination based on the papers." Id. at 143. If not, the court shall hold "a pretrial N.J.R.E. 104 hearing." Ibid. "[O]nly when the trial court has first determined that the evidence is of a quality to allow the jury to consider the probability of a zoning change should the jury be permitted to assess a premium based on that zoning change[.]" Id. at 142.

We express no opinion on whether defendants will be able to show such a reasonable probability. Nonetheless, we reject plaintiff's argument that testimony showing a reasonable probability would be improper because the cul-de-sac has not yet been constructed or because approval has not yet been received or is not certain. See, e.g., id. at 139 (noting a jury could

consider the reasonable probability of "future variance approval[,] . . . potential subdivision," and "future site plan approval when determining fair market value"); State v. Hope Road Assocs., 266 N.J. Super. 633, 645 (App. Div. 1993) (noting a jury could consider "the township's willingness to accept . . . a means of ingress and egress"), modified in part, 136 N.J. 27 (1994); see also Caoili, supra, 135 N.J. at 267-70 (distinguishing State v. Inhabitants of Phillipsburg, 240 N.J. Super. 529 (App. Div. 1990)).  If the court finds a reasonable probability, "the jury may consider the probability of the future zoning change or variance approval in determining the premium a buyer and seller would fix to the property."  66 East Allendale, supra, 216 N.J. at 140; see State v. 200 Route 17, L.L.C., 421 N.J. Super. 168, 179 (App. Div. 2011).

IV.

We next consider defendants' cross-appeal, which arises from the undisputed fact that the Property is contaminated.  In Suydam, supra, our Supreme Court held "contaminated property that is the subject of condemnation is to be valued as if it has been remediated."  177 N.J. at 7.  "[T]he condemnor should appraise as if remediated and deposit that amount into a trust-escrow account in court."  Id. at 24.  The contamination issue

is reserved for a subsequent "cost-recovery action" in which the condemnor can "recover any remediation costs." Id. at 22, 24.

Pending the cost-recovery action, "the condemnor may seek an order requiring a portion of the award to be set aside to satisfy the condemnee's clean-up and transfer obligations." Id. at 7. "When there is a dispute over the amount however, a trial-type hearing will be held under R. 4:73-9(b) at which the condemnor will bear the burden of supporting the estimate of [such] transactional costs." Id. at 26; see Casino Reinvestment Dev. Auth. v. Teller, 384 N.J. Super. 408, 416 (App. Div. 2006) ("Cleanup and remediation costs are transactional costs attendant to the condemnation proceeding.").

Here, we remanded for such a Suydam hearing. The parties submitted expert testimony and exhibits, including plaintiff's original and revised Property Acquisition and Environmental Cost Estimating (PAECE) reports. Plaintiff relied on its revised PAECE report, which called for removal of contaminated soil, hazardous materials, drums, and underground storage tanks.

In particular, plaintiff proposed to remove up to two feet of soil significantly contaminated by polychlorinated biphenyls (PCBs) from the northern two-thirds of the Property and to cap the Property with asphalt. Plaintiff asserted such remediation was needed to meet the requirements of the United States

Environmental Protection Agency (EPA) for remediating PCBs in "[h]igh occupancy areas." 40 C.F.R. § 761.61(a)(4)(i)(A) (2016). The EPA defines a "[h]igh occupancy area" as any area where an unprotected individual would spend more than "an average of 16.8 hours or more per week," such as "a residence." 40 C.F.R. § 761.3. The cost of remediating PCBs for such sustained occupancy accounted for most of the revised PAECE report's total estimated remediation cost of $1,967,865.

Defendants contended the remediation of PCBs should be only that required for a "[l]ow occupancy area," with exposure of less than 16.8 hours per week. Ibid. As a result, defendants' expert estimated remediation would cost below $500,000.

Defendants stressed that plaintiff originally condemned the Property with the intent to use it as the location of a shaft for the construction of the ARC Commuter Tunnel under the Hudson River. Thereafter, that project was cancelled. In its revised PAECE report, plaintiff stated: "The proposed use of this property has not been finalized, although NJ TRANSIT intends to use it for Public Transportation purposes."

After a three-day hearing, the trial court credited plaintiff's evidence and discredited defendants' expert. The court found that "[p]laintiff met its burden to prove that [its] cost estimation is not 'frivolous or exaggerated,' and that such

estimate is founded on reasonable and extensive environmental assessment of the property." On February 12, 2014, the court ordered the $1,967,865 to remain in escrow pending final determination of remediation costs at a cost-recovery action.

Defendants contend the estimate of remediation costs should have been based on the use of the Property which plaintiff originally intended — a tunnel shaft. Plaintiff contends the trial court properly based the estimated remediation costs on the highest and best use for the Property — residential development.

In considering these contentions, we find guidance in Suydam. There, our Supreme Court chose to value condemned contaminated property "as if remediated" rather than "as is." Suydam, supra, 177 N.J. at 23. The Court stressed that "'[t]he inquiry is not limited to the actual use of the property on the date of taking but is, rather, based on its highest and best use.'" Id. at 20 (citation omitted). The Court ruled "that valuing property as if remediated assures just compensation insofar as it relates to the notion of 'highest and best use.'" Id. at 23. The Court rejected valuing the property "as is" because "its contaminated state will necessarily circumscribe its uses, concomitantly diminishing its fair market value." Ibid.

Moreover, the Court in Suydam was concerned that parties not get "a windfall." See ibid. The Court emphasized the value of the property "as if remediated" was an "enhanced value [which] is to be generated by the incurring of a transactional cost." Id. at 25. "[T]he estimated value in a contamination case has a component that is altogether outside the property itself — the transactional cost that will be incurred to give the condemnee the benefit of the as if remediated value." Id. at 26. The Court found "withholding only the estimated transactional costs, which, in reality, do not belong to the condemnee," resulted in "no unfairness to the condemnee." Ibid. "What would be unfair would be to value the property as if remediated and allow the condemnee to withdraw that enhanced amount without a withholding to secure the transactional costs." Ibid.

Here, the trial court awarded defendants the enhanced value of the Property if used, and remediated, for residential development. Placing one "residence" or more on the Property would involve sustained occupancy sufficient to make it a "[h]igh occupancy area" and thus require more extensive remediation under EPA standards. 40 C.F.R. § 761.3. The estimated cost of such remediation was "folded into the estimate" of the Property's value and did not belong to

defendants. Suydam, supra, 177 N.J. at 25-26. Withholding that estimated cost was not unfair to defendants. By contrast, defendants would receive an unfair windfall if they were awarded the enhanced value of the Property as if remediated for residential development, without withholding the cost of such remediation.

Accordingly, we hold the escrow for the estimated costs of environmental cleanup of a condemned contaminated property should be based on the remediation necessary to achieve the highest and best use of the property used to calculate the amount of the condemnation award. This approach, like the approach adopted in Suydam, "most fairly treats both the condemnor and the condemnee." See id. at 27.

Defendants rely on Borough of Paulsboro v. Essex Chemical Corp., 427 N.J. Super. 123 (App. Div.), certif. denied, 212 N.J. 460 (2012). However, there "both parties' experts and the trial court attributed a lower value to the property because . . . [it was] occupied by a closed landfill." Id. at 131. Here, by contrast, defendants received a higher value for the Property because it was treated as remediated for residential development.

Defendants contend the Property would have been a "[l]ow occupancy area" if used for a tunnel shaft, the contaminated

soil would have been removed in constructing the shaft, and they should not have to escrow for construction costs. However, defendants' contentions lost their premise when the ARC Commuter Tunnel project was cancelled. In any event, defendants' contentions do not address the correct use. Because defendants were awarded compensation based on the highest and best use of residential development, it is appropriate to escrow the estimated amount needed to remediate for that use.

For the same reason, it is not dispositive what, if any, alternate use plaintiff will have for the Property now that the tunnel project has been cancelled. Indeed, defendants argue it would be unfair to make the remediation estimate depend on plaintiff's ultimate choice of an alternate use.

Defendants argue plaintiff will never remediate the Property to the level needed for residential development. That concern is addressed in Suydam. Under Suydam's approach, defendants will receive the portion of the escrowed amount which plaintiff does not spend to remediate the Property:

> [A] portion of the award sufficient to cover cleanup costs is escrowed or held in trust until the exact amount of cleanup costs has been determined. Once response costs are determined, a corresponding amount representing the owner's liability is then disbursed from the trust or escrow account. Only the surplus, if any, is paid to the owner.

A-3802-12T4

> [Suydam, supra, 177 N.J. at 25 (quoting 7A
> Nichols on Eminent Domain § 13B.03(4), at
> 13B-68 (Patrick J. Rohan & Melvin A. Reskin
> eds., 3d ed. 2002)).]

Thus, if plaintiff does not incur the full cost of remediating the Property to the "high occupancy" level, defendants will receive the resulting surplus funds from the escrow.

Defendants challenge the calculation of the estimated remediation costs. We may not "'disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Klumpp v. Borough of Avalon, 202 N.J. 390, 412 (2010) (citations omitted). We reject defendants' challenges for substantially the reasons given in the trial court's February 12, 2014 written opinion.

The trial court's Suydam hearing served to "obviate the concern" raised by defendants "over frivolous or exaggerated cleanup cost[]" estimates which "tie up the condemnee's award." Suydam, supra, 177 N.J. at 26-27. Defendants fault the pace of remediation, but they will be entitled to interest on any unpaid balance due to them when the escrow is distributed. N.J.S.A. 20:3-31.

Defendants stress plaintiff's original PAECE report estimated cleanup costs would be only $158,254. However,

plaintiff's initial appraisal asserted the highest and best use of the Property was industrial. Defendants then convinced plaintiff and the trial court the highest and best use of the Property was residential development. The revised PAECE report stated "the appraisers for NJ TRANSIT and the property owner have found a highest and best use of residential development," so the more stringent EPA requirements would have to be met "due to the high occupancy development scenario for the subject property." Thus, it was appropriate for plaintiff to change its estimate of remediation costs to reflect the more stringent remediation requirements for such sustained occupancy. 40 C.F.R. § 761.61(a)(4)(v).[9]

Furthermore, plaintiff's original PAECE report was merely "a preliminary environmental assessment" based on limited testing done while defendants were in possession of the Property. Suydam, supra, 177 N.J. at 26. In Suydam's companion case, the Supreme Court stated "a complete initial environmental investigation prior to condemnation is neither possible nor desirable in many cases because of the extent of the disruption it might entail." N.J. Transit Corp. v. Cat in the Hat, LLC,

---

[9] Defendants claim plaintiff's changed estimate was triggered by the cancellation of the tunnel project. Even if true, it is irrelevant, as remediation costs were properly estimated based on the use on which defendants' just compensation was awarded.

177 <u>N.J.</u> 29, 42 (2003). The Court recognized that, as a practical matter, "the most invasive environmental testing ordinarily takes place after condemnation when construction of a project begins. That is why the value as if remediated including transactional costs is merely an estimate" and why the condemnor can increase its estimate based on later testing. <u>Ibid.</u>

As set forth in the trial court's opinion, plaintiff advised defendants the estimate might increase. We reject defendants' argument that plaintiff failed to "turn square corners" regarding the revised estimate. <u>F.M.C. Stores Co. v. Borough of Morris Plains</u>, 100 <u>N.J.</u> 418, 426 (1985) (citation omitted); <u>see</u> <u>State v. Town of Morristown</u>, 129 <u>N.J.</u> 279, 286 (1992).

Defendants argue plaintiff waived its right to bring a cost-recovery action. However, plaintiff has consistently reserved that right in its complaint and thereafter. <u>See</u> <u>Suydam</u>, <u>supra</u>, 177 <u>N.J.</u> at 24; <u>Cat in the Hat</u>, <u>supra</u>, 177 <u>N.J.</u> at 41. We find "no factual foundation for" waiver. <u>Hous. Auth. v. Suydam Inv'rs, L.L.C.</u>, 355 <u>N.J. Super.</u> 530, 544 (App. Div. 2002), <u>aff'd o.b. in part, rev'd in part</u>, 177 <u>N.J.</u> 2, 28 (2003).

Finally, defendants claim judicial estoppel because plaintiff asserted in other litigation that a different property

condemned for the ARC Commuter Tunnel may have public uses, including for a different rail tunnel. However, plaintiff's assertions in the other litigation made no mention of defendants' Property. Plaintiff certainly did not assert defendants' Property would be used for a tunnel shaft, nor did the other court rely on such an assertion. See Bhagat v. Bhagat, 217 N.J. 22, 36 (2014). In any event, the escrowed estimated remediation costs depended on its use for residential development, as that was the basis for defendants' award.

Defendants' remaining arguments "are without sufficient merit to warrant discussion." R. 2:11-3(e)(1)(E).

V.

We reverse the March 4, 2013 final judgment and remand the case for a new trial on just compensation. We affirm the February 12, 2014 order. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION