**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2487-18T2

NEW JERSEY SPORTS AND
EXPOSITION AUTHORITY,

     Plaintiff-Respondent,

v.

TOWN OF KEARNY,

     Defendant-Appellant,

and

STATE OF NEW JERSEY, by
and through the TIDELANDS
RESOURCE COUNCIL,
THEODORE C. WILDMAN, and
all of his heirs, successors and
assigns, MIMI DEVELOPMENT
CORPORATION, its successor
HUDSON MEADOWS URBAN
RENEWAL CORPORATION, and
its further successor, SONEE
URBAN RENEWAL CORPORATION,

     Defendants.

_____

Submitted March 11, 2020 – Decided April 9, 2020

Before Judges Koblitz, Gooden Brown and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-2039-16.

Castano Quigley LLC, attorneys for appellant (Paul V. Fernicola, of counsel and on the brief; Gregory J. Castano Jr., on the briefs).

Lowenstein Sandler LLP, attorneys for respondent (James Stewart and Kent D. Anderson, on the brief).

PER CURIAM

Defendant Town of Kearny appeals from the December 19, 2018 final judgment for $1,818,000, awarded as just compensation for plaintiff New Jersey Sports and Exposition Authority's (NJSEA) condemnation of 104.64 acres of the Keegan Landfill (subject property). The trial court adopted the analysis and valuation set forth by NJSEA's appraisal. Kearny alleges the trial court made improper findings as a matter of law and erred when allowing NJSEA's rebuttal experts to testify. It also argues it was deprived of its right to a jury trial. We disagree and affirm.

In May 2016, NJSEA filed a verified condemnation complaint with the trial court. We affirmed "an order granting a final judgment authorizing [NJSEA] to exercise its power of eminent domain relating to the Keegan

Landfill."  N.J. Sports & Exposition Auth. v. Town of Kearny, No. A-5152-15 (App. Div. November 20, 2017) (slip op. at 2).

On March 9, 2018, NJSEA served expert reports from Jeffrey D. Kendall and John A. Castner.  Nineteen days later, Kearny for the first time made an unsuccessful request for a jury trial.  After depositions, Kearny's motion to bar the reports and testimony of Kendall and Castner and NJSEA's cross-motion to bar Kearny's rebuttal experts were denied.

In October 2018, Judge Francis B. Schultz presided over a five-day bench trial, hearing testimony from eight witnesses.  In a comprehensive letter opinion, he found that NJSEA's expert's valuation of the property was correct: the fair market value at the time of taking was $1,818,000.

We adopt the factual background to this matter as described in our prior opinion.  Id. at 3-9.

I.

A final determination made by a trial court conducting a non-jury case is "subject to a limited and well-established scope of review."  Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011).  We will not disturb the trial court's fact-findings unless we are "convinced that those findings and conclusions [are] 'so manifestly unsupported by or inconsistent with the competent, relevant and

reasonably credible evidence as to offend the interests of justice.'" Greipenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015) (quoting Rova Farms Resort v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Similarly, "a trial court's decision to admit expert testimony . . . [is] review[ed] . . . against an abuse of discretion standard." N.J. Transit Corp. v. Franco, 447 N.J. Super. 361, 369 (App. Div. 2016) (quoting Townsend v. Pierre, 221 N.J. 36, 53 (2015)).

We review de novo questions of law, only reversing if an error was "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2; see Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

II.

Because "the undisputed evidence demonstrated the actual, ongoing and continued use of the [s]ubject [p]roperty as a landfill," Kearny argues the trial court erred in relying upon NJSEA's appraiser's conclusion that the "highest and best use" of the property is for passive recreation.

When the government takes private property for public use, it must pay just compensation to the property owner. U.S. Const. amend. V; N.J. Const. art. I, ¶ 20. "Just compensation is 'the fair market value of the property as of the date of the taking, determined by what a willing buyer and a willing seller would

4

agree to, neither being under any compulsion to act.'" State by Comm'r of Transp. v. Caoili, 135 N.J. 252, 260 (1994) (quoting State by Comm'r of Transp. v. Silver, 92 N.J. 507, 513 (1983)). While "all reasonable uses of the property bear on its fair market value," the "most relevant . . . is the property's highest and best use." Ibid.

> "[H]ighest and best use" . . . is broadly defined as "the use that at the time of the appraisal is the most profitable, likely use" or alternatively, "the available use and program of future utilization that produces the highest present land value" provided that "use has as a prerequisite a probability of achievement."
>
> [County of Monmouth v. Hilton, 334 N.J. Super. 582, 587 (App. Div. 2000) (quoting Ford Motor Co. v. Twp. of Edison, 127 N.J. 290, 300-01 (1992)).]

The "highest and best use" of the property must be: "1) legally permissible, 2) physically possible, 3) financially feasible, and 4) maximally productive." Id. at 588.

Kearny's appraiser estimated the value of the entire Keegan Landfill, not just the subject property, to be worth $23,430,000. He assumed "assemblage": that a new buyer would also buy the portion of the property already owned by NJSEA and not at issue in this litigation. He confirmed that because "zone landfills are legally permissible" and because the property "is an operating

5

landfill," its use as such is legally permissible and physically possible. Although he agreed the property may operate for recreational use, he stated "[i]t won't be that for at least seven, eight years, or whenever the closure occurs."[1] As to the property's financial feasibility, the appraiser testified that based on his review of the income and expenses, the property will make "between $14[] and $16 million a year for the next seven years or so." He explained that because "a substantial net operating income" is generated, "the landfill is clearly the maximally productive or generates the highest income from any of the other uses that this property could be."

In contrast, NJSEA's appraiser, whose evaluation was accepted by the court, explained that his "appraisal values [were] . . . based on its highest and best use at the termination of the lease between [NJSEA] and [Kearny]," at which time operation of the landfill would cease. Although he acknowledged that NJSEA sought to renew the permit and increase the authorized height limit of the landfill, he clarified that those requests applied to the property as a whole, not just the subject property. Calculating the value under the "assumption" that operation of the landfill would cease, his estimated value of $1,888,000 applied

---

[1] We note as an aside that a March 6, 2020 consent order memorialized an agreement to permanently close the landfill expeditiously.

A-2487-18T2

only to the 104.64 acres of condemned property. In the appraiser's "highest and best use" analysis, he emphasized that due to the "large mound of garbage sitting in the middle of [the landfill], effectively sitting in a tidal marsh, with steeply sloped sides, [the landfill] ha[s] virtually no practical utility. You can't . . . do anything with it, you can't build on it." Because the property is "limited in its potential uses" and a "very highly constrained site," he concluded recreational use of the property satisfied the four "highest and best use" factors.

The trial court's letter opinion explained "that the preponderance of the evidence supports the plaintiff's position and . . . [']assumption.'" He found that Kearny's appraiser provided "no reason to assume such cooperation" between NJSEA and the new purchaser. Furthermore, Kearny's appraiser merely speculated that "the property already owned by the plaintiff would be used concurrently with the property at issue here." The trial court also took issue with Kearny's appraiser's calculation, which "included useless water as part of the percentage of income that would be split with an allegedly cooperating plaintiff" and the indemnification of the seller, which the trial court found might raise concerns for a prospective purchaser. Because "it appeare[d] that the landfill could not be operated solely on the Kearny portion as that would require

too many significant alterations," the court accepted NJSEA's appraiser's testimony that the property is "best suited for passive recreation."

Which appraiser was most convincing is a factual question that we review for an abuse of discretion. See Greipenburg, 220 N.J. at 254. Because the court's findings are supported by "adequate, substantial and credible evidence," reversal is not warranted. Rova Farms, 65 N.J. at 484.

III.

Kearny argues that the trial court's finding that "the evidence in this case could not point to a single sale of a public landfill to a private entity" is both irrelevant to the "highest and best use" analysis and factually incorrect because its own expert in the field of waste management said that such a sale was viable.

The likelihood of the sale of the property contributes to "a comprehensive market analysis to ascertain the supply and demand characteristics," which is required when determining the "highest and best use." County of Monmouth, 334 N.J. at 588 (quoting Six Cherry Hill, Inc. v. Twp. of Cherry Hill, 7 N.J. Tax 120, 131 (Tax 1984)). The trial court's finding is supported by the testimony of three of NJSEA's witnesses who were unaware of similar sales of a public landfill to a private entity.

IV.

Kearny argues that the trial court erred in finding that its appraiser's use of assemblage was speculative. Considering the history of the cooperation and the lease agreement between the parties, Kearny argues it reasonably incorporated into its just compensation calculation the value of the property already owned by NJSEA.

Kearny's appraiser testified:

> NJSEA had opened this landfill in 2009. . . . There's a history of cooperation. And clearly to get to your highest and best use, to get to this highest value all parties would want to cooperate so they could share in that.

He believed that because such cooperation has "been going on for years," after entering into an agreement, "NJSEA would share the income from the landfill business with the new buyer of the subject [property]." The court was free to reject this calculation.

V.

Kearny argues the court's finding that a prospective buyer may be concerned with the community's resistance to the landfill "has no basis in law or in any evidence." NJSEA, however, provided such evidence. The court admitted into evidence a letter from plaintiff, in which it objected to the

existence of a landfill in its town. While Kearny argues the letter was irrelevant, NJSEA argued that it demonstrated Kearny's "dual position" as the owner of the subject property and as the host community of the landfill. The court explained it would allow the letter into evidence "because a well-informed buyer would certainly want to know what the town of Kearny has to say about these things" because it might affect the buyer's decision to go through with the sale.

## VI.

Kearny argues indemnity is not relevant to the "highest and best use analysis." The value of a property, however, is "based on all surrounding circumstances at the time of the taking." Silver, 92 N.J. at 514. Whether a purchaser will require an indemnification from the seller is an important consideration regarding the sale of the subject property, particularly, as the trial court found, because of "[t]he potential exposure due to some sort of environmental mishap" present here.

## VII.

Kearny argues "[t]he record is devoid of any evidence to support" the court's conclusion that the landfill could not operate solely on the subject property. It asserts that by ignoring the testimony of its landfill expert, the court committed reversible error.

10

In examining the impediments surrounding a property, the party advocating a position "is required to come forward with reliable evidence that the 'feasibility, suitability and practicability' of its proposal make it reasonably probable that the development handicaps will be overcome and the requisite approvals will be secured." Jersey City Redevelopment Agency v. Mack Props. Co. No. 3, 280 N.J. Super. 553, 566 (App. Div. 1995) (citation omitted). Although Kearny's expert opined that it would be "technically feasible" to operate a landfill on only the subject property, he said he analyzed the entire Keegan Landfill, not just the subject property. To operate the landfill, various modifications to the subject property would need to be made, such as: capping the leachate[2] lines at the edge of the subject property, shifting the landfill mound so it would not encroach on NJSEA's property and creating a pump station to collect and transfer leachate. A permit modification would also be necessary.

Kearny also argues the record is devoid of evidence that "there is too much competition for the Keegan Landfill." NJSEA's experts, however, testified that

---

[2] Leachate is "a liquid waste product that consists of a diverse mixture of chemicals as precipitation or applied water moves through the waste." Landfill Leachate Released to Wastewater Treatment Plants and other Environmental Pathways Contains a Mixture of Contaminants including Pharmaceuticals, https://www.usgs.gov/mission-areas/environmental-health/science/landfill-leachate-released-wastewater-treatment-plants?qt-science_center_objects =0#qt-science_center_objects (last visited Mar. 18, 2020).

the landfill faces competition from transfer stations and railroads and it lost two customers months before the taking. The trial court's conclusion was supported by sufficient credible evidence.

## VIII.

Kearny argues the trial court erred in admitting the testimony of Castner and Kendall and their reports because they were not qualified to offer opinions on value and their reports did not comply with Rule 4:17-4(e). Kearny claims the "reports set forth inadmissible net opinions" that failed to explain "the facts, reasons or calculations that led to the conclusions."

Rule 4:17-4(e) requires that an expert report provided in response to an interrogatory "shall contain a complete statement of that person's opinions and the bases therefor; the facts and data considered in forming the opinions; the qualifications of the witness, including a list of all publications . . . and whether compensation has been or is to be paid." While Kendall failed to discuss in his report whether he was being compensated, NJSEA provided these reports to Kearny pursuant to Rule 4:73-11, not in response to interrogatories. Kendall explained in his report that he relied on the "profit and loss statement as provided by management" and he explained how he arrived at his calculations.

A-2487-18T2

The net opinion rule "forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." Townsend, 221 N.J. at 53-54 (quoting Polzo v. County of Essex, 196 N.J. 569, 583 (2008)). The expert must "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)). The rule, however, does not require "[a]n expert's proposed testimony . . . be excluded merely 'because it fails to account for some particular condition or fact which the adversary considers relevant.'" Townsend, 221 N.J. at 54 (quoting Creanga v. Jardal, 185 N.J. 345, 360 (2005)).

N.J.S.A. 45:14F-21(c) provides that unless an exception applies, only a licensed or certified real estate appraiser "or a person who assists in the preparation of an appraisal under the direct supervision of a State licensed or certified appraiser shall perform or offer to perform an appraisal assignment." Because neither Castner nor Kendall were real estate appraisers, Kearny argues they were unqualified to offer opinions on value. Neither of these experts, however, discussed valuation in their reports or testimony.

After setting forth Castner's qualification, respondent asked that he be qualified as "an expert witness as to the New Jersey regulations and the

permitting process for solid waste landfills." Kearny raised no objection and by stipulation, the court qualified Castner as such. Castner's testimony primarily "advise[d] the [c]ourt as to the process required and the amount of time it takes to obtain" permits. Any reference to the sale of the property was within the context of describing the process of transferring the permit.

Similarly, Kendall was qualified by stipulation "as an expert in the purchase and sale of . . . solid waste landfills." A "stipulation waives all challenges to the admissibility of . . . [an] expert's testimony." State v. A.O., 198 N.J. 69, 87-88 (App. Div. 2009). Kendall explained that he "was asked to look at [the] Keegan Landfill as a potential purchaser of the landfill and what price [he] would pay to purchase [it]." He discussed the factors a buyer would consider when considering purchasing the property and why he would not have been interested in doing so. While Kendall referred to various expenses and fees associated with the purchase of the property, such as taxes, value of the present cash flow and closure costs, he did not provide a value of the property. Instead, his discussion of valuation was limited to concluding that a sophisticated buyer would not purchase the property at any price. Castner and Kendall sufficiently supported their conclusions.

IX.

Kearny argues the trial court erred when denying its motion for a jury.  It contends that under Rule 1:3-4, the court should have relaxed the time restraint because NJSEA's "introduction of two new and highly technical expert reports shortly before [the] trial constituted 'good cause.'"

In a condemnation case, "[t]he appellant in the notice of appeal may demand trial by jury, or any other party may make such a demand within [ten] days after service of the notice of appeal." R. 4:73-6(a).  Pursuant to Rule 1:3-4, "[u]nless otherwise expressly provided by rule, a period of time thereby fixed for the doing of an act may be enlarged before or after its expiration by court order on notice or (unless a court has otherwise ordered) by consent of the parties in writing."  Although the Rule "does not contain any explicit standard for a court granting an enlargement of time," our court has recognized that a showing of "'extraordinary circumstances,' such as the 'interest of justice' or 'good cause,'" should be demonstrated by the moving party.  Flett Assocs. v. S.D. Catalano, Inc., 361 N.J. Super. 127, 133 (App. Div. 2003).

In denying Kearny's demand for a jury trial, made fifteen months past the permitted time, the court did not abuse its discretion.  Neither NJSEA nor Kearny made a jury demand in their notice of appeal to the trial court.  The new

expert reports did not constitute "extraordinary circumstances" warranting relaxation of the Rule. Kearny's right to a jury trial was not violated.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION