760 A.2d 786 (2000)
334 N.J. Super. 582
The COUNTY OF MONMOUTH, a Municipal Corporation of the State of New Jersey, Plaintiff-Appellant/Cross-Respondent,
v.
Robert E. HILTON, Defendant-Respondent/Cross-Appellant, and
Greenpoint Mortgage Corp.; Jersey Central Power & Light Company; New Jersey Bell Telephone Company a/k/a Bell Atlantic-New Jersey; Tax Collector, City of Long Branch; Sewer Collector, City of Long Branch Sewerage Authority; Edison Radiology Group, P.A.; Block 425, Lot 7, Long Branch, New Jersey; and Joseph Scibetta; Angelina Scibetta; Elizabeth Latzko, Widow a/k/a Elizabeth Latzko Brady; Carmela Sverapa; William A. Helstrom; Jo Cavaliere Helstrom; Jersey Central Power & Light Company; New Jersey Bell Telephone Company a/k/a Bell Atlantic-New Jersey; Tax Collector, City of Long Branch; Sewer Collector, City of Long Branch Sewerage Authority; Michael Sinatra; Block 425, Lot 8, Long Branch, New Jersey; and Theresa M. Schmelter, Married; National Westminster Bank, N.J.; Jersey Central Power & Light Company; New Jersey Bell Telephone Company a/k/a Bell Atlantic-New Jersey; Tax Collector, City of Long Branch; Block 425, Lot 9, Long Branch, New Jersey; and Thomas Ward; Tax Collector, City of Long Branch; Sylvia Hartstein; DRS Enterprises d/b/a Tire Craft TBA Division; Woodshire Apartments; State of New Jersey, Division of Unemployment and Disability Insurance; Hagedorn Center for Geriatrics; Block 425, Lot 10, Long Branch, New Jersey, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 19, 2000.
Decided October 23, 2000.
*787 Robert B. Thaler, Red Bank, argued the cause for appellant/cross-respondent (Mr. Thaler, on the brief).
Peter H. Wegener, Lakewood, argued the cause for respondent/cross-appellant (Bathgate, Wegener & Wolf, attorneys; Mr. Wegener, of counsel and on the brief).
Before Judges PRESSLER, KESTIN and CIANCIA.
PRESSLER, P.J.A.D.
This condemnation case requires us to address the question of whether and if so, the extent to which, the prospect of a future assemblage of the subject property with contiguous property owned by others in order to create a single integrated unit may affect the subject property's fair market value and hence the compensation for its taking that must be paid by the condemning authority. We hold that the reasonable probability of such an assemblage in the near future, as calculated from the taking date, may be found to enhance the value of the condemned property as of that date but that the property may not be valued by the finder of fact as if the assemblage had already then taken place. Because the testimony of the condemnee's expert misled the jury as to the effect of a prospective assemblage and the charge to the jury did not explain the significance and the proper use of prospective-assemblage evidence, we reverse the judgment entered in the condemnee's favor based on the jury verdict, and we remand for a new trial.
The facts relevant to our determination are largely undisputed. The subject property, owned by defendant Robert E. Hilton, is located in Long Branch and fronts on Ocean Avenue, directly across the street from the beach. It is approximately one-half acre in area and has a frontage of 104 feet. There was on the property on the date of taking, sometime between September 20 and October 3, 1996,[1] a large Victorian house built at the end of the nineteenth century, which had been converted into a five-family house and periodically *788 updated and renovated. Defendant resided on the third floor and each of the first two floors had two occupied apartments. The property was a protected prior non-conforming use, the Long Branch zoning ordinance having been previously amended to place it in the RC-1 zone, which excludes single-family residences, imposes a one-acre and 200 front-foot minimum and lists, as permitted uses, various types of multi-family developments, including mid-rise structures not exceeding six stories, townhouses, and waterfront mixed residential uses. The ordinance also permits specifically enumerated commercial uses, including restaurants, outdoor dining establishments, retail food stores, professional offices, and financial, insurance, and real estate services.
Defendant's property is located at the northern end of Long Branch, a concededly less desirable area than the upscale southern end, known as the West End and Elberon sections. There are two multifamily residential developments in the West End section. One property, now known as the Renaissance, was purchased by its developers in 1997. It includes 87 residential units of mixed residential use, comprises 9.2 acres, and is located on the ocean side of Ocean Avenue and hence is waterfront property, not waterview property as is defendant's. The second, known as The Villas, on the site of the former Harbor Island Spa, was purchased by its developers in 1993. It includes 55 units of mixed residential development, comprises 5.4 acres, and is also waterfront property.
With respect to the immediate area of defendant's property at the time of taking, just to its south were three contiguous vacant lots,[2] each in separate ownership, and each non-conforming in both area and frontage. Immediately south of those three lots and occupying the balance of the block to its southerly corner were two mid-rise multifamily dwellings built in the 1980s. Immediately to the north of defendant's property was another vacant lot, and north of that lot and running to the northerly corner was a group of older houses that had also been converted to multifamily use. The purpose of the condemnation by plaintiff County of Monmouth was to enlarge its Seven Presidents Oceanfront Park by the addition of defendant's property and the three vacant lots to the south. We further note that although all four of these parcels were included in the complaint, the condemnation of defendant's parcel was tried separately, and the other three are not before us.
The report of the commissioners appointed by the court to value defendant's property assigned a fair market value as of the date of taking of $293,000. Defendant appealed to the Superior Court pursuant to R. 4:73-6, and a jury trial ensued, resulting in a verdict fixing fair market value at $310,000. The court, however, granted defendant's motion for a new trial, and the matter was then retried. Following the second trial, the jury found the fair market value of defendant's property as of the date of taking to be $600,000. Plaintiff appeals, challenging both the new trial order and the basis of the jury verdict in the second trial. While we affirm the new trial order for the reasons we hereafter set forth, we are satisfied that the jury verdict in the second trial was so tainted by error as to require its reversal and a remand for a third trial.
We review the evidence at trial in the context of fundamental principles of condemnation. First, it is clear that private property may be taken for public use only upon the payment of "just compensation." N.J. Const. art. I, ¶ 20. Just compensation in its most general terms means the fair market value as of the date of the taking determined by what a willing buyer and a willing seller, neither being under any compulsion to act, would agree to. *789 See State v. Silver, 92 N.J. 507, 513-14, 457 A.2d 463 (1983) (further explaining that fair market value is "the value that would be assigned to the acquired property by knowledgeable parties freely negotiating for its sale under normal market conditions based on all surrounding circumstances at the time of the taking"). It is also well settled that in assigning fair market value, the inquiry is not limited to the actual use of the property on the date of taking but is, rather, based on its highest and best use. See, e.g., Ford Motor Co. v. Township of Edison, 127 N.J. 290, 301, 604 A.2d 580 (1992); State by Com'r of Transp. v. Hope Road Associates, 266 N.J.Super. 633, 641, 630 A.2d 387 (App. Div.1993), certif. granted, modified by 136 N.J. 27, 641 A.2d 1038 (1994). And "highest and best use" in turn is broadly defined as "`the use that at the time of the appraisal is the most profitable, likely use'" or alternatively, "`the available use and program of future utilization that produces the highest present land value'" provided that "use has as a prerequisite a probability of achievement." Ford Motor Co. v. Township of Edison, supra, at 300-01, 604 A.2d 580 (quoting Inmar Associates, Inc. v. Township of Edison, 2 N.J.Tax 59, 64-65 (Tax 1980)). See also American Institute of Real Estate Appraisers, The Appraisal of Real Estate, 275, 280-282 (10th ed.1992) (defining highest and best use as "the reasonably probable and legal use of an improved property which is physically possible, appropriately supported, financially feasible, and that which results in the highest value, i.e. most profitable").
Based on this general formulation, a four-prong test, routinely employed by the Tax Court in assessment determinations, has evolved by which highest and best use is determined. It is that use that is 1)legally permissible, 2)physically possible, 3)financially feasible, and 4)maximally productive. See, e.g., Entenmann's Inc. v. Totowa Borough, 18 N.J.Tax 540, 546 (Tax 2000); Schimpf v. Little Egg Harbor Tp., 14 N.J.Tax 338, 343-344 (Tax 1994); Chesterfield Associates v. Edison Tp., 13 N.J.Tax 195, 210, n. 6 (Tax 1993), aff'd, 14 N.J.Tax 181 (App.Div.1994); United Jersey Bk. v. Lincoln Park Bor., 11 N.J.Tax 549, 557 (Tax 1991). Thus, highest and best use is determined not only by the applicable legal and physical constraints, but "by competitive forces within the market where the property is located." Schimpf v. Little Egg Harbor, supra, 14 N.J.Tax at 344. That is to say, "`[t]he proper determination of highest and best use requires a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses.'" Six Cherry Hill, Inc. v. Cherry Hill Tp., 7 N.J.Tax 120, 131 (Tax 1984), aff'd, 8 N.J.Tax 334 (App.Div.1986) (quoting Barret, "A Restatement of Highest and Best Use," Real Estate Appraiser and Analyst, November December 1979 at 8).
The sole witnesses at trial were plaintiff's expert appraiser, Kenneth L. Walker, and defendant's experts, John P. Brody, his expert appraiser, and Robert J. Gorski, an architect. Plaintiff's expert opined that the highest and best use of the subject premises was its continuation as a protected pre-existing non-conforming five-family dwelling. On this basis, he considered all three methods of valuation, namely, cost less depreciation, income production, and comparable sales, concluding, based on the data he described, that these methods yielded a value of $314,000, $295,000, and $246,000, respectively. Explaining his reasons for believing that the comparable sales method was most reliable, his opinion was that the fair market value of the property was $295,000. He also testified that he had considered the value of the property as vacant land and as part of a prospective assemblage with the three southerly lots and had concluded that market conditions, including the high vacancy rates of the two mid-rise buildings on the same block, interdicted another mid-rise as a possible highest and best use of a prospective assemblage of the four parcels. He opined that the highest and best use of such an assemblage would be either town-house *790 or restaurant use and had concluded, based on the data he recited, that the land value in that case would be less than the fair market value of the present use.
Defendant took an entirely different tack. First, he had Gorski lay out a proposed plan for a mid-rise building on the hypothetical four-lot assemblage. Gorski testified that by complying with all the bulk requirements and restrictions of the zoning ordinance, he had designed a building with 92 units on an assemblage of defendant's property and the three southerly vacant lots. As we further understand his testimony, he asserted that the zoning officer had informally confirmed to him the compliance of his plan with the zoning ordinance. No building permit had, however, been applied for and no site-plan approval sought. Brody, in turn, testified that the highest and best use of defendant's property was a mid-rise building containing 92 residential units. He then proceeded to appraise the as-vacant land value of the property as if an assemblage of the four lots had already occurred as of the date of taking and a 92-unit multifamily project met prevailing market conditions as well as the other definitional standards of highest and best use. By applying comparable sales data involving five other multifamily developments, four in Long Branch and one in Holmdel, and making a variety of adjustments, including a 400 percent adjustment for the density of the proposed 92-unit mid-rise, he then concluded that the fair market value of defendant's property as of the date of taking was $729,000. It is apparent that the jury gave considerable weight to Brody's evaluation by returning a verdict fixing the value at more than twice Walker's appraisal and only 20% less than Brody's.
We pass what we regard as significant flaws in Brody's analysis of his underlying data[3] because we regard the basic premise of his methodology as erroneous. In sum, we are persuaded that appraising the value of defendant's property as if a four-lot assemblage had already taken place as of the date of taking and then basing highest and best use on such an assemblage constituted a fundamentally untenable and legally unsupportable approach.
On an initial and fundamental level, a proposed future assemblage of parcels in different ownership cannot be the basis for application of a highest and best use analysis as of the date of taking because as of that date the parcels have not yet been assembled into the integrated unit required to support that use. Thus at the very least, the tests of legal permissibility and present feasibility have not been met. That is not, however, to say that the prospect of such an assemblage is irrelevant to the fair market value of any of the individual parcels. It has long been settled that *791 as a matter of determining just compensation for an exercise of eminent domain, all of the circumstances surrounding the property, including all of the factors affecting the market, are germane to that determination. Thus, if there is a probability that there may in the near future be an assemblage of lots into a single integrated unit supporting a particular highest and best use, a willing buyer may well be willing to pay not merely for the property under its present constraints but, in addition to that present value, for the probability of such an assemblage as well. Obviously, the greater the probability, the more a buyer would be willing to pay for it. Hence, the reasonable probability of an assemblagenot merely a future assemblage that is hypothetical or speculative may enhance the fair market value of the property because it is a factor that would influence what a willing buyer would pay for it. But it cannot be the basis for determining market value as if the assemblage had already taken place. The distinction between enhancing market value and constituting the basis of market value is, in our view, critical, and it is that distinction that rendered defendant's appraisal methodology legally defective.
Although we are unaware of any reported case in this jurisdiction dealing directly with the question of the effect on market value of a prospective assemblage of disparately owned parcels,[4] we are persuaded that this issue is conceptually no different from the effect on market value of a prospective zoning change. The two situations are virtually identical in their salient character, that is, the prospect of a change in the basic circumstances surrounding the property that, if it occurs after the date of taking, would then permit a highest and best use different from and more profitable to the owner than the use existing or permissible as of the date of taking. And we are persuaded that the cogent analysis by Chief Justice Weintraub in the zoning-change situation applies in full measure to the future-assemblage situation. As he explained in State v. Gorga, 26 N.J. 113, 116, 138 A.2d 833 (1958):
It is generally agreed that if as of the date of taking there is a reasonable probability of a change in the zoning ordinance in the near future, the influence of that circumstance upon the market value as of that date may be shown.
But Chief Justice Weintraub then went on to make clear:

The important caveat is that the true issue is not the value of the property for the use which would be permitted if the amendment were adopted. Zoning amendments are not routinely made or granted. A purchaser in a voluntary transaction would rarely pay the price the property would be worth if the amendment were an accomplished fact. No matter how probable an amendment may seem, an element of uncertainty remains and has its impact upon the selling price. At most a buyer would pay a premium for that probability in addition to what the property is worth under the restrictions of the existing ordinance. In permitting proof of a probable amendment, the law merely seeks to recognize a fact, if it does exist. In short if the parties to a voluntary transaction would as of the date of taking give recognition to the probability of a zoning amendment in agreeing upon the value, the law will recognize the truth.
[Id. at 117, 138 A.2d 833] (Emphasis added).
*792 The rationale of Gorga has been reaffirmed by State by Com'r of Transp. v. Caoili, 135 N.J. 252, 262-265, 639 A.2d 275 (1994), which distinguishes, however, between the admissibility of evidence of the prospective change and the effect that change would have on fair market value as of the date of taking. The rule as enunciated by Caoili requires that the judge make a threshold determination as to whether the prospective zoning change is reasonably probable in the near future. If the judge is satisfied that that preliminary showing has been made, the evidence of probable change is admitted, and the jury must then make "the critical inquiry ... [of] the reasonable belief by a buyer and seller engaged in voluntary negotiations over the fair market value of property that a change may occur and will have an impact on the value of the property regardless of the degree of probability." Id. at 264-265, 639 A.2d 275. See also State by Com'r of Transp. v. Hope Road Associates, supra, 266 N.J.Super. at 642-43, 630 A.2d 387.
The prospect and consequence of a probable zoning change may be readily translated into the probable-assemblage situation. They share the same elements of a prospective change enhancing the value of the subject parcel by permitting a different and more profitable highest and best use. And we further point out that the eventual execution of a final contract for the purchase of land for development purposes is as fraught with contingencies as is the ultimate passage of the prospective zoning ordinance amendment.
Thus, as we understand Caoili, the first step in the two-step trial process is for the judge to make an initial, gatekeeping determination of whether an assemblage was probable in the near future as measured from the date of taking based on the evidence before him relating to market conditions and the circumstances particular to the property. There are obvious factors in this record as well as others that may be adduced on retrial that will require consideration. Among them is the fact that the three vacant lots have been zoned into inutility and, in fact, a variance application sought by one of the owners, who wanted to build a single-family residence, had been rejected. Also to be considered is the development policy of Long Branch that the zoning ordinance amendment reflects, namely, a desire to have the property within the RC-1 zone developed for multi-family or permitted commercial uses as well as the efforts that had been made by Long Branch to solicit the interest of developers of such uses. Of course, that proof cuts both ways since unsuccessful efforts might also demonstrate the market's lack of interest in such development, a factor militating against reasonable probability of an assemblage in the near future. Most significantly, the judge will have to consider, assuming the reasonable probability of an assemblage of some or all of the three vacant lots, whether it is also reasonably probable that defendant's lot, already an income-producing use, would be joined in that or any other assemblage. Moreover, evidence respecting the demographics of Long Branch and its surrounding area in terms of the demand existing on the date of taking for permitted multifamily units would be highly relevant as well as any other evidence respecting consumer demand and developer's costs.
If the judge determines that an assemblage including defendant's property was reasonably probable at a near-future time from the date of taking, then, according to the prescription of both Gorga and Caoili, the jury must be instructed to consider in its determination of fair market value the premium a willing buyer would pay for the probability of a future assemblage over and above the fair market value as represented by the existing use of the property.[5] In making this determination, we are persuaded *793 that a jury would have to determine the degree of probability of the assemblage since, as we have noted, the more probable the desired event is, the more valuable that probability is to a buyer and the greater the premium he would therefore be willing to pay. In this regard, we understand that what Caoili meant in the above quoted language respecting "an impact on the value of the property regardless of the degree of probability" was addressed to the court's gatekeeping function and not to the jury's determination. That is to say, the judge, in determining probability, need not determine degree of probability so long as there is reasonable probability, but the jury may consider the degree of probability, as indeed it must, in determining the extent of the premium the buyer would be willing to pay.
Although we have reached our conclusion by analogizing to the zoning-change prospect, other jurisdictions that have considered the prospective-assemblage issue in condemnation cases have reached similar conclusions based on the distinction we have drawn between a highest and best use realizable as of the date of the taking and one that is only probable in futuro and therefore only enhances fair market value but does not determine it. See, e.g., Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934) (where most profitable use of condemned property can only be made in combination with other property owned by others, probability of such combination may be considered to the extent it would affect market value); County of Santa Clara v. Ogata, 240 Cal. App.2d 262, 49 Cal.Rptr. 397 (1966) (reasonable probability of joinder of condemned property with adjacent city-owned property added an increment of value to the condemned property); City of Indianapolis v. Heeter, 171 Ind.App. 119, 355 N.E.2d 429 (1976) (reasonable probability of an assemblage may be considered as enhancing market value); City of Lafayette v. Richard, 549 So.2d 909 (La.Ct.App. 1989) (probability of assemblage of disparately owned parcels could be considered as tending to increase the property's value); Petition of Central School District # 1, 78 Misc.2d 60, 355 N.Y.S.2d 947 (Sup. Ct.1974) (reasonably probable assemblage of disparately-owned parcels must be determined not as though the combined use was an accomplished fact but in terms of what a willing buyer would pay, in addition to what the property was worth without the assemblage, for the probability of that use); Clarmar Realty Co., Inc. v. Redevelopment Auth. of City of Milwaukee, 129 Wis.2d 81, 383 N.W.2d 890 (1986) (property owner may introduce evidence that the fair market value of the condemned property is enhanced by a probable assemblage).
We consider briefly plaintiff's argument that the judge erred in ordering a new trial following the first trial of the cause. The basis of the ruling was the judge's admission, over defendant's objection, of letters written by defendant to the condemning authority complaining of the proposed condemnation and expressing his rather fervent desire to retain his property and his home. On post-trial motion, the judge was satisfied that he had erred because the admission of these letters prejudiced defendant's reliance on an assemblage theory. For the reasons we have already stated, we concur that a property owner's subjective feelings regarding a proposed condemnation are hardly relevant, if relevant at all, in determining, based on appropriate objective factors, what he would be likely to do based solely on prevailing market conditions without threat of condemnation. In short, an owner's wish not to have his property condemned should not factor into the determination of fair market value once it is condemned. Deferring to the trial judge's "feel" of the case, we cannot conclude that he erred in finding that the first verdict had constituted a miscarriage of justice within the intendment of R. 2:10-1. See also Dolson v. Anastasia, 55 N.J. 2, 6-8, 258 A.2d 706 (1969).
*794 Finally, defendant has cross appealed from the rate of interest allowed by the judge on the condemnation award. Although we note that the rate of interest is ordinarily a matter within the court's discretion and an abuse of discretion must therefore be demonstrated, see Jersey City Redev. v. Clean-O-Mat, 289 N.J.Super. 381, 400, 673 A.2d 1360 (App.Div.), certif. denied, 147 N.J. 262, 686 A.2d 763 (1996), the issue is in any case moot in view of the need for a new trial. We assume that on retrial the court will be guided by the principles expressed in Jersey City Redev., supra.
The judgment appealed from is reversed, and we remand for a new trial consistent with this opinion.
NOTES
[1] There was dispute between the parties as to whether the taking date was the late September date or the early October date. The parties agreed, however, and we concur, that the correct date between the two is immaterial to the issues here presented.
[2] At the time of the taking, the most southerly of the three lots south of plaintiff's property had on it the remnants of a burnt-out house.
[3] We point out, merely by way of illustration, that two of the five land sales for mid-rise development Brody relied on had taken place in the 1980s, a period which all the experts had agreed was one of inflated property values followed by a marked decline starting in late 1987. The per acre price of the two mid 1980s land sales was $1,225,547 and $1,851,851, and as to the first of these, no mid-rise was ever built and the property was eventually used for restaurant purposes. It is, therefore, doubtful that the two earlier sales were comparable. Of the three later sales, one preceding the condemnation by about three years and the other two occurring more than a year thereafter, the per acre vacant land price ranged from $250,000 to $383,000. Moreover, two of the three later sales were for mixed residential use on waterfront property, again sufficiently not comparable as to require substantial adjustments for location. But even without those adjustments, the per acre price, applied to defendant's premises, would yield a value less than that of plaintiff's appraisal. Perhaps most glaring of all was Brody's 400% density adjustment for the subject premises on the assumption that the zoning officer's informal expression was an approval, that site plan approval would be forthcoming for a 92-unit structure, and that cramming so many units on the acreage produced by the assemblage would nevertheless make the units marketable at approximately the same level as the luxury units on the two waterfront properties. Finally, we note that Brody did not consider any of the other permitted uses for the assemblage.
[4] We are aware that an assemblage was considered in the context of severance damages in State v. Bakers Basin Realty Co., 138 N.J.Super. 33, 350 A.2d 236 (App.Div.1975), aff'd o.b., 74 N.J. 103, 376 A.2d 1189 (1977). In that case, however, the assemblage was not merely prospective because a third person had contracted to buy the parcels constituting the assemblage prior to the date of taking albeit after the State's intention to take a part of the assemblage was known. Because of the doctrine of equitable conversion, there was thus a unity of ownership on the date of taking, not disparate titles such as we have here.
[5] We recognize that in view of the non-conformance of the lot, there would be no other permissible use available as of the date of the taking.