**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5335-17T3

PARKING AUTHORITY OF
THE CITY OF CAMDEN, a body
corporate and politic of the State of
New Jersey,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

ESTATE OF MILTON RUBIN,
a/k/a MICKEY RUBIN, fee owner,

      Defendant-Respondent/
      Cross-Appellant,

and

V & T INC., tenant,

      Defendant.
_____

ESTATE OF MILTON RUBIN,

      Plaintiff,

      v.

PARKING AUTHORITY OF
THE CITY OF CAMDEN,

     Defendant.

_____

Argued December 2, 2019 – Decided February 11, 2020

Before Judges Fasciale, Moynihan and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket Nos. L-3605-14 and L-2436-14.

Michael J. Ash argued the cause for appellant/cross-respondent (Carlin & Ward, PC, attorneys; Michael J. Ash, of counsel and the briefs).

Robert Baranowski argued the cause for respondent/cross-appellant (Hyland Levin Shapiro LLP, attorneys; Robert Baranowski and Megan Knowlton Balne, on the briefs).

PER CURIAM

Plaintiff Parking Authority of the City of Camden appeals from four orders related to a condemnation action through which it acquired a property previously owned by defendant Estate of Milton Rubin, a/k/a Mickey Rubin. A jury trial was held to determine the property's value. Plaintiff's expert valued the property at $180,000, while defendant's expert valued it at $9,000,000. The difference between these valuations was, in part, due to defendant's expert's opinion that defendant would have been able to rent the entire property, upon

renovating it, to a tenant in receipt of significant tax incentives. After hearing testimony from both parties' experts, the jury awarded defendant $3,000,000. On appeal, plaintiff contends that the jury should not have heard defendant's expert testimony as to the property's value because it was speculative. Plaintiff also contends that the judge erroneously set the valuation date as the date of the taking, rather than the date on which plaintiff initiated the condemnation action. Defendant cross-appeals, arguing that the judge should have applied the prime interest rate to its condemnation award. Having reviewed the record, and in light of the applicable law, we affirm.

## I.

We recite the relevant facts from the record. In 1979, Milton "Mickey" Rubin acquired a roughly .22-acre property located in the City of Camden Center City Zone. The property was improved by an eight-story, approximately 80,000-square-foot building that was constructed in 1932. For several years, Rubin leased the first floor to retailers and leased the remaining seven floors to Glassboro State College and the civil service training center for use as office and classroom space. In 1986, he sold the property for $2,700,000, holding a $2,000,000 mortgage for the buyer. The buyer subsequently sold the property to an investor group for $2,900,000, and Rubin still held the mortgage. In 1992,

the college and civil service training center moved out, and soon after, the mortgagor ceased making payments. The mortgagor also failed to pay the utility bills, which caused the pipes to break throughout the building, damaging the carpet, walls, and ceilings. Thereafter, defendant[1] initiated a foreclosure action and paid the back taxes, insurance expenses, and maintenance and repair costs. In 2006, defendant obtained title to the property again, after the execution of a sheriff's deed.

During October 2007, defendant agreed to sell the property for $4,500,000. Defendant extended the time for closing through 2012, but the sale never closed. In 2013, defendant listed the property for sale through a broker, for $4,500,000. From 2007 through 2014, defendant continued to maintain the property and pay the property taxes, which, during the last four years, were based on a valuation of $1,662,400.

In March 2014, plaintiff notified defendant of its intent to purchase defendant's property to construct a public parking garage. Plaintiff first offered defendant -$200,000. Consequently, defendant filed a complaint, seeking to preclude plaintiff from "initiat[ing] condemnation proceedings unless and until

---

[1]  Rubin passed away in 1996. Thereafter, Steven Rubin, his son and the executor of his estate, acted on defendant's behalf, as he had been working with his family in the real estate industry for several years.

[it] makes a proper, good faith, bona fide offer to pay just compensation." The parties entered into a consent order to stay any condemnation proceedings, and they agreed to negotiate in good faith.

Thereafter, plaintiff hired Pamela J. Brodowski of BRB Valuation & Consulting Services. As of July 11, 2014, Brodowski valued the property at $180,000, after concluding that the property's highest and best use was "its existing retail use as an interim use, with one retail tenant on the first floor." Relying on this valuation, plaintiff offered defendant $180,000, but defendant rejected the offer. Consequently, on September 18, 2014, plaintiff initiated a condemnation action against defendant.[2]

Meanwhile, in May 2014, defendant hired Richard F. Wolf of Valbridge Property Advisors. On August 29, 2014, Wolf requested information from the State about the "possibilities of renovating the [property] using . . . tax incentives," and he received an immediate response from Joseph Constance, Business Advocate of the Business Action Center of New Jersey Department of State. On September 8, 2014, defendant and Wolf met with Constance, and they

---

[2] Plaintiff also named V & T Inc. as a defendant. V & T Inc. had rented space on the first floor of the property to operate a pizza shop. It was the last retailer to leave the property, and it vacated the space as of August 31, 2014 due to the condemnation proceedings. V & T Inc. did not participate in the proceedings below and has not participated in this appeal.

discussed defendant's property as well as several programs that could potentially offset future renovation and occupancy costs. Constance agreed to meet with them again after defendant obtained "renderings of the building '[a]s [r]enovated' to use as marketing materials." After the meeting, Constance sent defendant documentation about various cost-saving programs, including the Grow New Jersey Assistance Program (Grow NJ).

Grow NJ was established "to encourage economic development and job creation and to preserve jobs that currently exist in New Jersey but which are in danger of being relocated outside of the State." N.J.S.A. 34:1B-244(a). The program provides tax incentives to eligible businesses for up to ten years. Ibid. To be eligible to apply for these incentives, a business must, among other things, "make, acquire, or lease a capital investment . . . at a qualified business facility" where it will retain and create new full-time jobs. N.J.S.A. 34:1B-244(a)(1). The amount of the capital investment and the number of new jobs required vary depending on the project and geographic location. N.J.S.A. 34:1B-244(b), (c).

Defendant and Wolf met with Constance again, on October 15, 2014, after obtaining the requested renderings. Constance informed them that "based on the plans presented and the ability to deliver a turnkey building in approximately twelve months, a rent of $35.00 per square foot, on a net basis, for the first ten

years and $25.00 per square foot for the following ten years was achievable."

Constance also told defendant that he was aware of two potential tenants that would be interested in renting the renovated property.

On December 3, 2014, final judgment was entered in the condemnation action. The judge awarded plaintiff "immediate and exclusive possession" of the property and required plaintiff to deposit $180,000 with the court. The judge also appointed three commissioners to appraise the property. On December 5, 2014, plaintiff filed a declaration of taking and deposited $180,000 with the court. The following February, the appointed commissioners held a hearing and awarded $180,000 to defendant. Defendant appealed the award, and the judge ordered a jury trial to determine the property's value. On July 27, 2015, Judge Robert G. Millenky issued an order setting December 5, 2014 as the valuation date.

In late 2015, the parties exchanged valuation reports. Plaintiff obtained a second report from Brodowski to account for the December 5, 2014 valuation date. Brodowski maintained that the property's highest and best use was "its existing retail use as an interim use, with one retail tenant on the first floor" and again valued the property at $180,000, using the income capitalization approach and incorporating comparable rental rates into the analysis. Brodowski's

7

valuation did not account for any potential benefits of Grow NJ, as she opined that there was no indication of the program's impact on the Camden real estate market.

Defendant obtained a valuation report from Wolf (the Wolf Report). Wolf concluded that "[t]he highest and best use of the . . . property, as improved, is for renovation of the shell into Class A office space." He valued the property at $9,000,000, using the income capitalization approach and integrating the cost approach. Like Brodowski, Wolf also incorporated comparable rental rates, but the rates differed from those used in Brodowski's valuation. Wolf opined that the property was in a "very unique position" in the Camden market, due to the Grow NJ tax incentives "recently available to companies" located in Camden. He also relied on his and defendant's communications with Constance the previous year.

Plaintiff moved to strike the Wolf Report, and a hearing was held before Judge Millenky on February 19, 2016. Plaintiff claimed that Wolf's methodology was speculative because there was no more than a mere possibility that a tenant of the renovated property would receive Grow NJ tax incentives, and the report also failed to account for the risk associated with obtaining site approval for future renovations. Plaintiff requested an N.J.R.E. 104 hearing, but

Judge Millenky declined to hold one after finding that the Wolf Report contained sufficient evidence to allow the jury to find that there was a reasonable probability that Grow NJ had impacted the Camden real estate market. However, he agreed with plaintiff's concern about the lack of analysis regarding the reasonable probability of land use approvals. Thus, the judge approved the Wolf Report, subject to defendant securing an additional expert opinion on the land use approval issues, and he issued a written order denying plaintiff's motion on March 2, 2016.

To comply with the judge's order, defendant produced a planning report addressing the land use issues, which he obtained from Lance B. Landgraf, Jr., a professional planner. Landgraf opined that if defendant was required to submit a site plan application, "it would have been approved . . . because the renovation plans present a permitted use under both the [z]oning [o]rdinance and the [Camden Downtown] Redevelopment Plan, with a continuation of non-conforming physical site conditions that pre-dated the [z]oning [o]rdinance and the [Camden Downtown] Redevelopment Plan." As to the property's lack of off-street parking, Landgraf opined that "the [p]roperty would maintain its 'grandfathered' status" because the proposed renovations would not have enlarged the structure or resulted in an increase in intensity. Thus, according to

Landgraf, defendant would not have been required to obtain a variance. Alternatively, Landgraf opined that defendant would have been able to obtain a variance if needed. Plaintiff also produced a planning report, which conflicted with Landgraf's opinion.

Thereafter, plaintiff filed a second motion to strike the Wolf Report, arguing, among other things, that "it [was] not based on a legally permissible use" because Landgraf's opinion as to the parking issue was incorrect. Relying on the nonconforming use statute and related case law, Judge Millenky rejected this claim because a "fact-finder could reasonably conclude . . . that this office building constituted a preexisting, nonconforming use, and that renovations to the property would constitute, therefore, changes that . . . would not defeat the nonconforming use preservation . . . with regard to the issue of parking."

The judge first determined that the nonconforming use statute, N.J.S.A. 40:55D-68, was not superseded by any provision within the local redevelopment and housing law, N.J.S.A. 40A:12A-1 to -49. He then found that the nonconforming use had not been terminated by abandonment. Although the "property ha[d] not been used for a substantial period of time as an office building," defendant had not used it for another purpose and continued maintaining the property. He further found that the proposed renovations would

not have resulted in total destruction of the property. The steel skeleton and the roof would remain intact, and the proposed design changes would not have changed the footprint of the building. Lastly, the judge determined that a change in ownership was not controlling; rather, the status of the land itself determines whether the structure qualifies as a preexisting, nonconforming use.

While the judge concluded that this analysis was sufficient to decide the parking issue, he nonetheless considered whether there was sufficient evidence to conclude that defendant could have obtained a variance. He found that the planning board had previously made reasonable accommodations for properties without appropriate off-street parking, such as permitting off-site parking by either paying the city to construct spaces or purchasing spaces from a third party. Thus, the judge denied plaintiff's second motion to strike the Wolf Report and issued an order to that effect on July 5, 2016. At the final pretrial hearing, plaintiff filed another similar motion, but the motion was denied by the newly assigned Judge Michael E. Joyce.

Judge Joyce held a seven-day jury trial during April 2018. The jury heard testimony from several witnesses, including Steven Rubin, Landgraf, and Wolf.

Steven Rubin testified to the property's ownership history, including the sales for $2,700,000 and $2,900,000 and the subsequent agreement to sell the

11

property for $4,500,000 in 2007. He further testified that he had been planning to renovate the property as early as 2004 and that he had continued to maintain it and pay the property taxes, based on an assessed value of $1,662,000 from 2011 through 2014.

Landgraf testified, among other things, that the property's lack of off-street parking was a preexisting nonconforming condition. Relying on both the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, and the Camden Downtown Redevelopment Plan (CDRP), Landgraf opined that the property's proposed use would have been a permitted use, so any existing nonconformity would have been permitted to remain on the property without the need for a variance. Alternatively, Landgraf opined that if defendant had been required to seek a variance, the property would have met the criteria for either a hardship variance or a flexible variance. With respect to the positive criteria, he opined that granting the variance would "[p]rovide sufficient space in appropriate locations for a variety of commercial uses to meet . . . the needs of all New Jersey citizens" and that several modes of public transportation were nearby. Further, he opined that permitting the renovations would allow for the development of "work space and aesthetic enhancements" through a "more efficient use of land." As to the negative criteria, he opined that granting a

variance would not substantially harm the public because the site already lacked off-street parking, and there was public transportation nearby. Further, a variance would not impair local zoning regulations because defendant's proposed development only furthered the city's ambition to encourage commercial development in Camden.

Wolf testified to the methodology he used in valuing the property, as presented in the Wolf Report. He testified that after plaintiff's offer to purchase the property for $180,000, he researched Grow NJ's impact on the Camden real estate market and found that it had created an increase in demand for Camden properties and, consequently, an increase in Camden property values. His research led him to conclude that defendant's property was worth more than $180,000. Other factors influencing his opinion as to the property's value included the 2007 agreement to sell the property for $4,500,000 and the 2013 property listing for $4,500,000. Although the 2007 agreement was from several years earlier, he found it relevant because the 2014 market was significantly better than the 2007 market, in part due to Grow NJ.

Wolf further testified to the September 8, 2014 meeting with Constance, at which they discussed defendant's property, how Grow NJ operated, and the possibility of Grow NJ benefitting defendant through the property. Although he

was not permitted to testify that Constance had potential tenants interested in renting defendant's property and that defendant would have been able to rent the property for $35 per square foot, he did testify, generally, that he learned there were tenants looking to move to Camden, and there were certain market rental rates that he could consider. Based on the information he learned from his meetings with Constance, he testified that he was able to conclude that if any employer had rented the entirety of defendant's property, it could benefit significantly from Grow NJ. This led Wolf to conduct further market research, which included serving subpoenas on Grow NJ applicants developing property in Camden.

In reaching his $9,000,000 valuation, Wolf testified that he determined the property's highest and best use and then calculated the property's value using the income capitalization approach. He explained how he determined, under both single tenant and multiple tenant scenarios, the numbers for market rent per square foot, vacancy/credit loss, landlord expenses, capitalization rate, cost of renovations, lost rent, leasing commissions, and entrepreneurial incentive.

At the end of the trial, the jury returned a verdict for just compensation in the amount of $3,000,000. On June 7, 2018, Judge Joyce held a hearing to determine the interest rate to apply to defendant's award. Defendant requested

14

that the judge apply the prime rate, relying on the expert testimony of Chad R. Keeports, a certified public accountant and certified valuation analyst. However, the judge concluded that the court rule rate would best indemnify defendant for the loss of use of its just compensation. He found the following facts relevant: the court rule rate remained stable throughout the proceedings; when plaintiff initiated the condemnation action, the property was losing money; and defendant requested an award three times the amount the jury awarded, indicating its demand may have been unreasonable. While the judge did not blame the parties for "vigorously litigating this case," he noted that the length of the proceedings may have been due to defendant's efforts to obtain information about Grow NJ. On June 12, 2018, the judge issued an order for final judgment fixing just compensation. This appeal ensued.

On appeal, plaintiff raises two main issues. First, plaintiff contends that the valuation date should have been the date on which plaintiff filed its complaint, not the date on which it filed the declaration of taking and deposited the just compensation funds. Second, plaintiff contends that admission of testimony based on the Wolf Report was erroneous because it was speculative. Plaintiff asserts that there was not a reasonable probability that defendant would have rented the renovated property to a recipient of Grow NJ tax incentives.

Further, plaintiff asserts that defendant's valuation also relied on the incorrect assumption that it would not have needed to provide off-street parking.

In its cross-appeal, defendant contends that the prime rate, rather than the court rule interest rate, should have been applied to its just compensation award.

## II.

We begin our discussion with the general principles that apply in a condemnation case. When the government takes private property for public use, it must pay just compensation to the property owner. U.S. Const. amend. V; N.J. Const. art. I, ¶ 20. "Just compensation is 'the fair market value of the property as of the date of the taking, determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion to act.'" Comm'r of Transp. v. Caoili, 135 N.J. 252, 260 (1994) (quoting State v. Silver, 92 N.J. 507, 513 (1983)). While "all reasonable uses of the property bear on its fair market value," the "most relevant . . . is the property's highest and best use." Ibid. (citing Comm'r of Transp. v. Hope Rd. Assocs., 266 N.J. Super. 633, 641 (App. Div. 1993)).

> "[H]ighest and best use" . . . is . . . "the use that at the time of the appraisal is the most profitable, likely use" or alternatively, "the available use and program of future utilization that produces the highest present land value" provided that "use has as a prerequisite a probability of achievement."

16

> [County of Monmouth v. Hilton, 334 N.J. Super. 582,
> 587 (App. Div. 2000) (quoting Ford Motor Co. v.
> Township of Edison, 127 N.J. 290, 300-01 (1992)).]

The use must be "1) legally permissible, 2) physically possible, 3) financially feasible, and 4) maximally productive." Id. at 588.

In reviewing a judge's decision to admit expert testimony in a condemnation case, we "apply a 'deferential approach . . . reviewing it against an abuse of discretion standard.'" N.J. Transit Corp. v. Franco, 447 N.J. Super. 361, 369 (App. Div. 2016) (quoting Townsend v. Pierre, 221 N.J. 36, 53 (2015)). We apply the same standard in reviewing a judge's determination of the appropriate interest rate to apply to a just compensation award. Township of W. Windsor v. Nierenberg, 345 N.J. Super. 472, 478-79 (App. Div. 2001). We review questions of law de novo, Manalapan Realty, L.P. v. Township Comm. of Manalapan, 140 N.J. 366, 378 (1995), and we will reverse only if an error was "of such a nature as to have been clearly capable of producing an unjust result," R. 2:10-2.

## III.

We now turn to the parties' arguments on appeal. We first address plaintiff's claim that the judge erred in setting the valuation date, and we

conclude that the judge correctly set the date as the date on which plaintiff filed the declaration of taking.

The Eminent Domain Act of 1971 requires that just compensation be calculated as of the earliest of several dates:

> (a) [T]he date possession of the property being condemned is taken by the condemnor in whole or in part; (b) the date of the commencement of the action; (c) the date on which action is taken by the condemnor which substantially affects the use and enjoyment of the property by the condemnee; or (d) the date of the declaration of blight[.]
>
> [N.J.S.A. 20:3-30.]

We have previously discussed "[t]he relationship between [this statute] and the constitutional provisions governing the exercise of eminent domain." Township of Piscataway v. S. Wash. Ave., LLC, 400 N.J. Super. 358, 372-74 (App. Div. 2008). "[A]rbitrary application of N.J.S.A. 20:3-30 to set the valuation date . . . as of the date the . . . condemnation action was filed is not required where application of the statute would result in unjust compensation to the property owner." Id. at 372-73 (alterations in original) (quoting City of Ocean City v. Maffucci, 326 N.J. Super. 1, 16 (App. Div. 1999)). "The Legislature 'may prescribe a rule of damages more favorable to the landowner than that which would satisfy the minimum requirement of the Constitution,' but 'it cannot adopt

a measure which will detract from that compensation.'" Id. at 373 (quoting Jersey City Redevelopment Agency v. Kugler, 58 N.J. 374, 384 (1971)).

Just compensation is determined as of the date of taking. E.g., Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984); Hous. Auth. v. Suydam Inv'rs, L.L.C., 177 N.J. 2, 14 (2003) (quoting Hilton, 334 N.J. Super. at 587); Piscataway, 400 N.J. Super. at 373 ("When the property increases in value due to inflation or market factors unrelated to the initiation of the condemnation action, the valuation date must be the date of the taking."). "[T]he date of taking is the date on which the declaration of taking is filed accompanied by the deposit of the just compensation[.]" Piscataway, 400 N.J. Super. at 373 (citing N.J.S.A. 20:3-19; N.J.S.A. 20:3-21(a)). This rule does not prejudice the State, who could have avoided any increase in value by filing the declaration of taking and depositing the just compensation on the date it filed its complaint. Id. at 374 (citing N.J.S.A. 20:3-17); see also N.J.S.A. 20:3-18.

While the plain language in our statute suggests that the date on which plaintiff filed its complaint would be the proper valuation date, we conclude that the judge correctly set the date of taking as the valuation date, considering the relevant constitutional principles. The date of taking is December 5, 2014, the date on which plaintiff filed the declaration of taking and deposited the just

19

compensation with the court. See N.J.S.A. 20:3-21(a). During oral argument, defendant argued that the property had increased in value between September 2014 and December 2014, due to Grow NJ's impact on the Camden real estate market. Requiring the parties to appraise the property as of September 18, 2014 would have resulted in unjust compensation to defendant. See Piscataway, 400 N.J. Super. at 372-73. Accordingly, we conclude that the judge did not err in setting December 5, 2014, the date of taking, as the valuation date.

IV.

Next, we address plaintiff's claim that defendant's expert should not have been permitted to testify as to the property's value based on his valuation as presented in the Wolf Report. We first consider Wolf's reliance on Grow NJ's benefits and then Landgraf's opinion that defendant would not have been required to provide off-street parking. We conclude that admission of the related testimony was not error because the expert reports contained sufficient evidence to support the experts' opinions.

New Jersey Rules of Evidence 702 and 703 govern the admissibility of expert testimony at trial. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training,

20

or education may testify thereto in the form of an opinion or otherwise." N.J.R.E. 702. The facts upon which an expert bases his or her opinion "may be those perceived by or made known to the expert at or before the hearing[,]" and "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions[,] . . . the facts . . . need not be admissible in evidence." N.J.R.E. 703.

The net opinion rule "forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." Townsend, 221 N.J. at 53-54 (quoting Polzo v. County of Essex, 196 N.J. 569, 583 (2008)). A conclusion "based merely on unfounded speculation and unquantified possibilities" is inadmissible. Id. at 55 (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)). The expert must "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)). However, the expert may not base their opinion solely on their own subjective standard. Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011) ("[I]f an expert cannot offer objective support for his or her opinions, but testifies only to a view about a standard that is 'personal,' it fails because it is a mere net opinion."). If a party challenges the qualifications of a proposed expert or the admissibility of the proposed expert's testimony, "the

[judge] may hear and determine [the] matter[] out of the presence or hearing of the jury." N.J.R.E. 104(a).

## A.

Our Supreme Court has articulated the test for deciding whether a judge may permit the jury to consider expert testimony about a property's future use in determining its value:

> The jury . . . need not be required to find that the . . . change is probable. . . . [T]he critical inquiry is the reasonable belief by a buyer and seller engaged in voluntary negotiations over the fair market value of property that a change may occur and will have an impact on the value of the property regardless of the degree of probability. . . .
>
> In conclusion, we now hold . . . that in determining the fair market value of condemned property as a basis for just compensation, the jury may consider a potential . . . change affecting the use of the property provided the court is satisfied that the evidence is sufficient to warrant a determination that such a change is reasonably probable. If evidence meets that level of proof, it may be considered in fixing just compensation in light of the weight and effect that reasonable buyers and sellers would give to such evidence in their determination of the fair market value of the property.
>
> [Caoili, 135 N.J. at 264-65.]

Thus, the judge performs "a gatekeeping function by screening out potentially unreliable evidence and admitting only evidence that would warrant or support

a finding that a . . . change is probable." Id. at 264. While Caoili addressed a potential zoning change, we have applied this standard in other contexts.

In Hilton, 334 N.J. Super. at 589-594, we applied Caoili where the defendant's expert valued the subject property by assuming there would be an assemblage of lots and a newly constructed building, and then considering sales data of comparable properties. We recognized that "a willing buyer may well be willing to pay not merely for the property under its present constraints but, in addition to that present value, for the probability of such an assemblage as well." Id. at 591. However, because the defendant's expert's methodology valued the property "as if the assemblage had already taken place," we held that it was "legally defective." Ibid. "The distinction between enhancing market value and constituting the basis of market value is . . . critical[.]" Ibid.

We addressed a similar situation in State ex rel. Commissioner of Transportation v. 200 Route 17, L.L.C., 421 N.J. Super. 168 (App. Div. 2011). The defendant's expert opined that a property's highest and best use was as renovated and, consequently, its value on the date of taking was the renovated value less the renovation costs. Id. at 172. We framed the issue as follows: "What would a willing buyer pay a willing seller, without compulsion, for a substandard building, knowing that the buyer would be obligated to obtain

23

appropriate land use and building approvals, as well as spend [a certain number of] dollars for the property to achieve its highest and best use?" Id. at 175. We rejected the expert's methodology because it "assum[ed] that the building was already improved and then deduct[ed] the costs of improvement." Ibid. "[A] buyer might pay a premium if it knew that such an investment would result in the property's highest and best use, but to suggest that the buyer would pay 'full value' is speculative at best." Ibid. Accordingly, the State must

> pay for the building "as is," considering the reasonable probability of future renovations and approvals required to improve the property to its highest and best use, discounted by the risks and costs of such venture, just as a buyer would pay for the building in its current condition, then make any improvements necessary to bring the building to the buyer's desired use.
>
> [Id. at 179.]

We conclude that neither judge abused his discretion in finding that the evidence was sufficient to allow the jury to find that defendant would have benefitted from Grow NJ had it renovated the property and subsequently rented it to a Grow NJ recipient. Wolf's valuation is unlike those we rejected in Hilton, 334 N.J. Super. 582, and 200 Route 17, 421 N.J. Super. 168, because his valuation was not based on the assumption that defendant's property had already been renovated and rented to a Grow NJ recipient.

Wolf first valued the property as renovated. He considered potential gross income based on comparable properties renting to Grow NJ recipients, vacancy loss, credit loss, and regular accounting and legal fees, and he multiplied the resulting value by a capitalization rate. Then, he discounted the value to account for renovation costs, lost rent, leasing commissions, and entrepreneurial incentive. This entrepreneurial incentive accounted for "the profit that is required to stimulate an investor to purchase the building in its '[a]s is' condition, find a tenant, and renovate the building considering all the risk involved with the transaction." This methodology recognizes "[t]he [critical] distinction between enhancing market value and constituting the basis of market value." 200 Route 17, 421 N.J. Super. at 175; Hilton, 334 N.J. Super. at 591.

The judge hearing plaintiff's first motion to strike the Wolf Report fulfilled his gatekeeping function by finding that there was sufficient credible evidence that a willing buyer would have considered the probability that defendant's property, as renovated, could have been rented to a Grow NJ recipient. The judge decided that an N.J.R.E. 104 hearing was unnecessary, as the Wolf Report contained adequate evidence to reach a determination as to the admissibility of its contents. Based on the Wolf Report, he concluded that Grow NJ's impact on the Camden real estate market was "readily apparent." Before

25

defendant's property was taken, there was extensive construction in Camden, including the construction of a Subaru headquarters that would contain substantial office space. Subaru, along with four other entities, were granted millions of dollars in Grow NJ tax incentives over a ten-year period. Further, Wolf had spoken with a state representative, Constance, who had estimated rental rates for defendant's property, as renovated. Therefore, plaintiff's claim that it was unlikely that defendant would have benefited from Grow NJ is of no concern because the Wolf Report contained sufficient credible evidence that defendant could have benefited, and the issue of the degree of probability that it would have benefited was properly left for the jury to decide. See Caoili, 135 N.J. at 264-65.

We add that the jury apparently shared plaintiff's concern, as it only awarded defendant $3,000,000, a third of the amount proposed in the Wolf Report. This value was also supported by other evidence in the record, including two prior sales of the property, for $2,700,000 and $2,900,000, and a prior agreement for sale of the property, for $4,500,000. Accordingly, we conclude that the judge did not err in admitting testimony about Grow NJ's potential benefits.

A-5335-17T3

B.

A property's "highest and best use[] must be considered in light of any zoning restrictions that apply to the property." Caoili, 135 N.J. at 260. The CDRP requires newly developed property used as office space to provide "1 parking space for every 1,000 [square feet] of professional space." Camden Downtown Redevelopment Plan, at 46 (Oct. 2004) [hereinafter CDRP].[3] The Camden Land Development Ordinance imposes a similar requirement, but the CDRP supersedes it. Camden, N.J., Land Development Ordinance § 577-230(f) (2009); CDRP, at 56 ("All ordinances . . . inconsistent with this [CDRP] are repealed to the extent of such inconsistency only.").

Under the MLUL, "[a]ny nonconforming use or structure existing at the time of the passage of an ordinance may be continued upon the lot or in the structure so occupied and any such structure may be restored or repaired in the event of partial destruction thereof." N.J.S.A. 40:55D-68. Parking conditions in existence before the adoption of an ordinance imposing new parking requirements may be protected as a nonconforming use. Dresner v. Carrara, 69

---

[3] The CDRP was adopted by ordinance in September 2005. Camden, N.J., Ordinance 4108 (Sept. 8, 2005). Its contents can be found at http://camdenredevelopment.org/getattachment/d0e1b389-c31d-452a-b3be-567d273318e0/Redevelopment-Plan.aspx.

27

N.J. 237, 240 (1976); Wawa Food Mkt. v. Planning Bd., 227 N.J. Super. 29, 37-38 (App. Div. 1988) ("[W]here the nature and intensity of the business remains the same, continued use of the property without off-street parking is protected as a nonconforming use."); see also Reich v. Borough of Fort Lee Zoning Bd. of Adjustment, 414 N.J. Super. 483, 503 (App. Div. 2010).

Although the CDRP, adopted pursuant to the Local Redevelopment Housing Law, controls redevelopment within Camden, it does not supersede the MLUL. "[S]ince the two statutes deal with the same subjects of zoning and land development, . . . we construe the two statutes in pari materia." Weeden v. City Council, 391 N.J. Super. 214, 228 (App. Div. 2007); see DePalma v. Bldg. Inspection Underwriters, 350 N.J. Super. 195, 222 (App. Div. 2002). Construing the LRHL and the MLUL together, we perceive no issue with applying the MLUL's protection for nonconforming uses where a municipality has adopted a redevelopment plan that does not explicitly provide for the same protection. The LRHL does not contradict the MLUL's provision for nonconforming uses. Britwood Urban Renewal, LLC v. City of Asbury Park, 376 N.J. Super. 552, 566-67 (App. Div. 2005). Moreover, the CDRP provides that a variance may be granted, CDRP, at 50, indicating that the CDRP was not intended to preclude all deviations from the plan when new development occurs. See Motley v. Borough

of Seaside Park Zoning Bd. of Adjustment, 430 N.J. Super. 132, 144 (App. Div. 2013) ("Municipalities may not, however, take 'active' steps to eliminate nonconforming uses, and must wait with 'fervent hope that they would in time wither and die and be replaced by conforming uses.'" (quoting Fred McDowell, Inc. v. Bd. of Adjustment, 334 N.J. Super. 201, 214 (App. Div. 2000))).

We now consider whether there was sufficient evidence indicating that the property's lack of off-street parking could have qualified for protection as a nonconforming use under the MLUL. The property owner bears the burden of establishing that the condition at issue was "a nonconforming use as of the commencement of the changed zoning regulation" and that it continued afterward. S & S Auto Sales, Inc. v. Zoning Bd. of Adjustment, 373 N.J. Super. 603, 613 (App. Div. 2004). However, nonconforming uses may be terminated if the use is substantially enlarged, Grundlehner v. Dangler, 29 N.J. 256, 263 (1959), or abandoned, S & S Auto Sales, 373 N.J. Super. at 613 (citing Borough of Saddle River ex rel. Perrin v. Bobinski, 108 N.J. Super. 6, 16 (Ch. Div. 1969)). Total destruction of the property also terminates a nonconforming use. S & S Auto Sales, 373 N.J. Super. at 619-620.

Where the issue of abandonment is raised, the property owner must show that they did not intend to abandon the nonconforming use and that they did not

in fact abandon the use.  Id. at 613-14.  "Mere passage of time during a cessation of active use does not constitute abandonment."  Id. at 617.

> As the passage of time increases, . . . two things must be kept in mind:  (1) some discontinued uses are more readily revivable than others, and (2) the passage of time must be considered in conjunction with all circumstances, including those that caused the cessation, the nature and quality of efforts being made to resume the use, and any other objective manifestations supporting or negating the owner's expressed intention to continue the use.
>
> [Id. at 618.]

Where property destruction is at issue, the court's analysis must be guided by the "discrete facts presented," as our Legislature has not defined either total or partial destruction.  Motley, 430 N.J. Super. at 144, 146.  "Prior cases have construed total destruction to mean 'substantially totally destroyed.'"  Id. at 144 (quoting Camara v. Bd. of Adjustment, 239 N.J. Super. 51, 56 (App. Div. 1990)).  We will consider "whether the destruction is so substantial in nature— qualitatively if not quantitatively—to surpass the 'partial' threshold that the statute expresses."  Id. at 148-49 (nonconforming use was terminated where one of two stand-alone residences was destroyed by construction activity, except for the foundation and footings); see also Township of Lacey v. Mahr, 119 N.J. Super. 135, 138 (App. Div. 1972) (use of a building as an inn was substantially

totally destroyed where 69% was totally destroyed by fire and 14% was badly gutted); <u>Krul v. Bd. of Adjustment</u>, 122 N.J. Super. 18, 28-29 (Law Div. 1972), <u>aff'd</u>, 126 N.J. Super. 150 (App. Div. 1973) (nonconforming use was not terminated where main building in a complex of buildings was totally destroyed by fire because the newly proposed structure was to be constructed on the same foundation, "the nature of the contemplated use is exactly the same," and there was no "extension or expansion of the physical structure or its use").

We conclude that the judge did not abuse his discretion in finding that there was sufficient evidence to allow the jury to find there was a reasonable probability that defendant would not have needed to provide off-street parking. Landgraf opined that the lack of off-street parking was a preexisting nonconforming condition, since defendant's property was constructed before Camden adopted the CDRP and the current city code. He explained that the nonconforming condition was "a valuable property right" transferred with ownership of the property and would "continue with the property until the use is either abandoned or the structure in which the non[]conforming use operates is substantially or completely destroyed." Thus, he concluded that defendant would not have been required to seek a variance for the lack of off-street parking.

Although Landgraf's report did not provide a detailed explanation on this issue, the judge found that Landgraf's opinion was supported by other evidence in the record. The judge reasoned that the property's use was neither abandoned nor totally destroyed. Although the property was not in operation at the time of the taking, it was previously used as office space for a substantial period of time, defendant had not used it for any other purpose, and defendant had planned to renovate it for further use as office space. In addition, defendant had maintained the property by paying the property taxes and replacing the roof. Moreover, defendant's proposed renovations would not have resulted in total destruction of the property because the foundation, roof, and structural members would have all remained intact throughout the proposed renovations. Accordingly, we conclude that Wolf's valuation was not unsupported for a lack of providing for the need to seek a variance to remedy the absence of off-street parking.

V.

Finally, we address defendant's cross-appeal, regarding the appropriate interest rate applied to a just compensation award. We conclude that the judge did not abuse his discretion in determining that the court rule interest rate best indemnified defendant.

A-5335-17T3

The State shall pay interest on a just compensation award, reduced by the amount deposited with the court, "from the date of the commencement of the action until the date of payment of the compensation."  N.J.S.A. 20:3-31.  "Unless agreed upon by the parties, the amount of such interest shall be fixed and determined by the court in a summary manner after final determination of compensation[.]"  N.J.S.A. 20:3-32.  Since there is no uniform rate, the judge selects one "on a case-by-case basis."  Nierenberg, 345 N.J. Super. at 479.  "The judge should consider the prevailing commercial interest rates, the prime rates of interest, and the legal rates of interest, and select the rate which will best indemnify the condemnee for the loss of use of the [just] compensation[.]"  Id. at 478 (internal quotation mark omitted) (quoting Township of Wayne v. Cassatly, 137 N.J. Super. 464, 474 (App. Div. 1975)).

In deciding to apply the court rule interest rate, the judge relied on several factual findings:  the court rule interest rate had remained stable throughout the proceedings; defendant's property was losing money at the time of the taking; defendant had requested an award three times the jury's verdict; and defendant contributed to delays in the proceedings.  We have held that the court rule interest rate adequately compensated a defendant in a similar situation.  See Casino Reinvestment Dev. Auth. v. Hauck, 317 N.J. Super. 584, 595 (App. Div.

1999) (affirming application of the court rule interest rate where the rate was stable throughout condemnation proceedings, and the defendant contributed to the length of the proceedings by unreasonably demanding an award twice the amount of the jury verdict).

Additionally, we reject defendant's claim that the judge should have considered other factors causing delays in the proceedings, such as plaintiff's and the court's conduct. It is not our role to second guess the judge's decision where the record supports it. See Nierenberg, 345 N.J. Super. at 478-79. We add that during oral argument, the judge asked defendant whether there were any factors, other than market factors, that should be considered, but defendant provided none, reasoning that the judge could "exercise judicial discretion" and apply "other factors that [he] determine[d] to be relevant and appropriate." Accordingly, we conclude that the judge properly exercised his discretion.

To the extent that we have not addressed the parties' remaining arguments, we conclude that they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5335-17T3